Appeal from Third District.

## MILLER v. MARKS.

No. 2643.   Decided December 1, 1914.   Rehearing denied May 8, 1915
(148 Pac. 412).

1. BILLS AND NOTES—ACTION—FINDINGS OF FACT—CONCLUSIONS.
Where, in an action on a note by an indorsee, the makers relied
on the defenses-that the note was without consideration and
was obtained by fraud, and that the indorsee took it without
value, and with notice, a finding that plaintiff was an innocent
purchaser for value, without knowledge of any defect in or
defense to the note, and acted in good faith in the transac-
tion, and was a holder in due course for a valuable consid-
eration paid before maturity, was sufficient, though in the na-
ture of conclusions.[1]   (Page 260.)

2. BILLS AND .NOTES—BONA FIDE HOLDER—BURDEN OF PROOF.   An
indorsee of a note has, on proof of defective title of the in-
dorser, the burden of showing, as required by Comp. Laws
1907, Sections 1604, 1611, that he acquired title as a holder in
due course, and took the note in good faith for value, without
notice of any infirmity in the instrument or defect in the title
of the indorser.[2]   (Page 260.)

3. APPEAL AND ERROR—RECORD—OPINION OF THE TRIAL COURT.   The
opinion of the trial court, though settled in the bill of excep-
tions and made a part of the record, cannot be looked to to
ascertain what the court found or decided, but the findings, con-
clusions and judgment, filed and entered must alone be looked
to for that purpose, and cannot be qualified by any prior oral
or written opinion of the court.[3]   (Page 260.)

4. APPEAL AND ERROR—RECORD—OPINION OF TRIAL COURT.   Where
the opinion of the trial court is settled in the bill of excep-
tions, and made a part of the record, the court on appeal may
look to it to ascertain the trial court's reason for its decision.[4]
(Page 261.)

[1]*Bank* v. *Nelson*, 38 Utah 169, 111 Pac. 907.

[2]*Leavitt* v. *Thurston*, 38 Utah 351, 113 Pac. 77.

[3]*Grand Cent. M. Co.* v. *Mammoth M. Co.*, 29 Utah 490, 83 Pac. 648;
*Victor M. Co.* v. *National Bank*, 18 Utah 93, 55 Pac. 72, 72 Am. St.
Rep. 767.

[4]*Bank* v. *Fox*, 44 Utah 323, 140 Pac. 660.

Vol. 46—17

5. APPEAL AND ERROR—PRESUMPTIONS—CORRECTNESS OF RULING ON BURDEN OF PROOF. Until the contrary is shown by the record, the court on appeal will presume that the court trying the case without a jury ruled correctly on the burden of proof, but the presumption may be overcome by anything properly settled in the bill of exceptions, and made a part of the record, including the opinion of the court. (Page 261.)

6. APPEAL AND ERROR—HARMLESS ERROR—ERRONEOUS RULINGS ON BURDEN OF PROOF. Where the undisputed evidence affirmatively showed that an indorsee suing on a note acquired title as a holder in due course a judgment for him will not be disturbed, though the court erroneously placed on the maker the burden of proving that plaintiff was not a holder in due course. (Page 261.)

7. BILLS AND NOTES—BONA FIDE HOLDER—NOTICE OF INFIRMITY IN NOTE—EVIDENCE. That an indorsee of a note for $2,500 paid $2,100 or $2,300 therefor does not raise a presumption of knowledge on his part of some infirmity in the note. (Page 262.)

8. BILLS AND NOTES—"HOLDER IN DUE COURSE"—STATUTORY PROVISIONS—EVIDENCE. Under Comp. Laws 1907, Sections 1604, 1606, 1611, defining a "holder in due course" as one taking the instrument in good faith and for value without notice of any infirmity in the instrument or defect in the title of the indorser, and providing that when the transferee receives notice of any infirmity in the instrument or defect in the title before he has paid the full amount, he will be deemed a holder in due course only to the amount previously paid, and that every holder is deemed *prima facie* a holder in due course, an indorsee of a note who, in due course and without notice, delivered a check therefor to the indorser, but who received notice of infirmity in the note before payment of the check, which was paid when presented, acquired the note in due course, without notice, (Page 265.)

9. BILLS AND NOTES—BONA FIDE PURCHASER—PAYMENT. To constitute payment to protect a purchaser of a negotiable instrument, the consideration need not be in cash, but may consist of anything constituting a valid consideration of sufficient value. (Page 271.)

10. BILLS AND NOTES—BONA FIDE PURCHASER—PAYMENT. Where negotiable checks are exchanged for a negotiable note, each is an independent obligation and a sufficient consideration for the other, and a purchaser has made payment when the instruments are delivered, and the exchange is complete, unless the checks are not paid, nor intended to be paid. (Page 271.)

McCARTY, C. J., dissenting.

Appeal from District Court, Third District; *Hon. M. L. Ritchie*, Judge.

Action by *N. W. Miller* against *L. A. Marks*.

Judgment for plaintiff. Defendant appeals.

AFFIRMED.

*M. E. Wilson* for appellant.

*Booth, Lee, Badger, Rich & Parke* for respondent.

STRAUP, J.

This is an action to revover on a negotiable promissory note executed and delivered by the defendant to one Conrad, the payee, and by him indorsed and delivered to the plaintiff before maturity. The defense is that the note was given without consideration, and was obtained through fraud and misrepresentations on the part of Conrad, and that the plaintiff took it without value and with notice. The case was tried to the court, who found that the note was given without consideration, and was obtained through fraud, but found that:

"The plaintiff was an innocent purchaser for value without knowledge of any defect in or defenses to said note, and acted in good faith in said transaction, and is a holder in due course of said note for a valuable consideration paid before maturity."

Judgment was accordingly entered in favor of the plaintiff. The defendant appeals. He urges that the quoted finding is not a finding of fact, but mere statements of conclusions, and is insufficient, as to such issue, to support the judgment; that the court cast the burden of proof on him to show that the plaintiff was a purchaser with notice, and not in good faith; and that the evidence, without substantial conflict, shows that the plaintiff did not acquire title as a holder in due course.

A finding of what the plaintiff paid or gave for the note, of the ultimate facts and circumstances under which he pur-

chased it, and what knowledge or notice, or the want of it, concerning the alleged and found defect or infirmity, was possessed by him, would have been more in compliance with the Code respecting findings. While the finding complained of is more in the nature of conclusions than of fact, still we think it sufficient as to such issue to support the judgment. *Bank* v. *Nelson,* 38 Utah, 169, 111 Pac. 907.

In an opinion delivered by the court after a submission of the case for decision, but before findings were made, the court stated, in effect, that the burden of proof was on the defendant to show that the plaintiff purchased with notice, and not in good faith. But thereafter, and before findings, the case was reopened, reargued, and resubmitted. The opinion is settled in the bill of exceptions, and is made a part of the record. Because of what was stated therein, the defendant asserts that the court, as to that issue, erroneously cast the burden of proof on him. The rule is, as contended by the defendant, that upon proof of defective title the burden was on the plaintiff to show that he acquired title as a holder in due course, which, so far as here material, means that he took the note in good faith and for value, and that at the time it was negotiated to him he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it to him. Comp. Laws 1907, Sections 1604, 1611; *Leavitt* v. *Thurston,* 38 Utah, 351, 113 Pac. 77. The respondent does not dispute the proposition, but asserts there is nothing properly before us to show that the court cast such burden on the defendant, and urges that the opinion, though settled in the bill, can nevertheless not be considered by us; and though it be considered, yet the record, showing the reopening, reargument, and resubmission of the case after the opinion was delivered, and before findings, does not affirmatively show that the court so regarded the question of burden upon finally considering the evidence and making findings.

It is true, as contended, that the opinion cannot be looked to to ascertain what the court found or decided. The findings, conclusions, and judgment, as made, filed, and entered, must alone be looked to for that, and can-

not be qualified or limited by any prior oral or written opinion of the court or judge. *Grand Central M. Co.* v. *Mammoth M. Co.*, 29 Utah, 49, 83 Pac. 648; *Victor M. Co.* v. *National Bank*, 18 Utah, 93, 55 Pac. 72, 73 Am. St. Rep. 767.

But it also has been held by this court that, when an opinion, as here, is settled in the bill and made a part of the record, it is properly before us; and, while "it amounts to no judicial finding of fact, and has no judicial effect," yet it "may be looked to to ascertain the judge's reasons for his decision." *Bank* v. *Fox*, 44 Utah, 323, 140 Pac. 660. There are instances where a finding may have been influenced or induced by views entertained by the court as to burden of proof.

Here, after proof adduced that the title of the person negotiating the note to the plaintiff was defective, the law cast the burden on the plaintiff to show that he acquired title as a holder in due course. If the court reached the conclusion that the plaintiff was a purchaser in good faith, without notice and for value, because the defendant had not sustained the burden showing the contrary, then would the finding be influenced by an erroneous view of the law, and ought not to stand, unless the evidence, without substantial conflict, supports the finding, in which case it is immaterial what view the court took as to burden of proof. Until the contrary is made to appear, the presumption will be indulged that the court regarded the party as having the burden on whom the law cast it. It, in effect, is claimed that, to overcome the presumption, nothing but the findings can be looked to. They, in some instances, may show how the court regarded the question of burden; in others, not. Here, looking at the findings, there is nothing but the presumption to indicate how the court regarded it. In such case we think the presumption may be met or overcome by looking at anything properly settled in the bill and made a part of the record, and which tends to indicate how the question was regarded and treated. As the opinion is settled in the bill, and thus made a part of the record, we think it may be looked to for that purpose. Whether it is sufficient to overcome the presumption is another thing; since, after the opinion was

delivered, and before findings, the case was reopened, reargued, and reconsidered. It, however, is unnecessary to decide that, for the finding that the note was obtained through fraud and by misrepresentations is not assailed, and because the evidence respecting the question of whether the plaintiff was a bond fide purchaser for value without notice is substantially without conflict. Hence whether the plaintiff did or did not acquire title as a holder in due course becomes a question of law, rather than of fact; and, if the undisputed evidence affirmatively shows that the plaintiff acquired title as a holder in due course, he is entitled to prevail, though the court, as to that issue, may have mistaken the law as to burden of proof.

The evidence, without substantial conflict, shows that the plaintiff and the defendant both resided in Salt Lake City. Conrad, an agent of the Aegis Life Ins. Co., sold the defendant 100 shares of the capital stock of that company at twenty-five dollars per share, in consideration 7 of which the defendant, on the 25th day of November, 1912, gave him his promissory note for $2,500, payable to Conrad or order at a designated bank in Salt Lake City on or before sixty days after date. The note itself recites that it was given for 100 shares of the capital stock of that company. The plaintiff for some time had been in the business of buying notes. He was not acquainted with either the defendant or Conrad. One Hemple, who was acquainted with both the plaintiff and Conrad, and knowing that the plaintiff was buying notes, informed him one evening on the street car that Conrad had the defendant's note, and gave him Conrad's address. Plaintiff, on inquiry at banks, finding that the standing and financial ability of the defendant were good, called on Conrad on the afternoon of a Saturday, the 30th of November, and, as he testified, offered to purchase the note at a ten per cent. discount. Conrad refused to take that, but as the plaintiff testified, offered to sell for $2,350. They then reached no agreement and parted, with the understanding that they would meet the next day to further consider the matter. The plaintiff, contemplating he might purchase the note, and not having sufficient funds at the bank with which to pay for it,

that afternoon, after he left Conrad, arranged with his bank to borrow $1,100 in the event he needed it, upon a note to be signed by himself and his wife, and took with him a blank note to be executed. The note was signed that afternoon, but not delivered. On the next day he again met Conrad, and then agreed to purchase the note for $2,300, as testified to by the plaintiff, and not $2,100, as deposed by Conrad in his deposition. That day being Sunday, nothing further was done until the next morning, December 2d, at which time they again met at about nine or nine thirty, when Conrad indorsed and delivered the note to the plaintiff. The plaintiff intended giving his check for the full amount of the purchase price, with the request that it be not presented until the next day, because, as then stated by him, he "was a little shy at the bank." But, as Conrad claimed to be in immediate need of money, the plaintiff gave him $100 in cash, and one check for $200 and one for $2,000, with the request that it be not presented until the next day, when sufficient funds would be on deposit to meet it. After the exchange and delivery of the note and checks the plaintiff went to his home, prepared a notice notifying the defendant of the purchase of the note, and then went to the defendant's residence that day about 11:45 a. m., and, as he testified, read the notice to the defendant. The defendant then told him that he had signed the note, and that it was given for stock purchased by him, but stated that he would not pay it, because of fraud and misrepresentation on the part of Conrad in selling the stock. That, as testified to by the plaintiff, was the first information or knowledge he had of any infirmity in the note, or that there was any question whatever about it. No witness testified to, nor is there anything to show, the contrary. The defendant testified that no notice was shown or read to him, but that the plaintiff, between 10:30 and 11:30 on the morning of December 2d, came to his house and informed him that he had purchased the note, and asked him if he had signed it. The defendant replied, "I signed the note all right, but it was obtained under a misrepresentation, and I do not think I will pay it," and further testified that the plaintiff told him that he had purchased it at a ten per cent. discount. He,

as he testified, then asked the plaintiff if he did not think "that was an awful discount on a note of a man that has got my standing in town, and wouldn't you naturally think there was something wrong in the first place when a man would discount a note to that extent," and that the plaintiff replied, "No," and stated that he always got ten per cent discount. The plaintiff sought Conrad at about one o'clock and told him of his interview with the defendant, and that he claimed the note was obtained by misrepresentations, and that he told him he would not pay it. Conrad replied that the defendant "was a baby; I never made a fairer or squarer deal with a man in my life than I did with that man; some man here in town went and told him he bought the stock for twenty dollars a share; now he is bellyaching about it." The plaintiff asked Conrad "to call the deal off," and stated, "While I bought the note in good faith, I would like to get out of this thing if I could do it reasonably," and spoke of stopping payment on the checks. Conrad replied: "You have got a good note. You bought it and paid for it, and the man (the defendant) will have to pay it. If you start anything like that you will get up against it. It will cost you more than it will to keep that note. * * * If you undertake that (stop payment) you will be mighty sorry, for I will make it cost you more than what you get out of this thing. You have got something good now. You better stay by it and not interfere with your checks." The defendant also came up town and met the plaintiff, as he testified, between twelve and one o'clock, and said to him, "You are about as bad as the man I gave the note to," and that the plaintiff replied that he was sorry, "I looked at it that way, and said he had bought the note in good faith." The plaintiff did not stop payment on the checks. He, that afternoon, after three o'clock, completed his arrangements with the bank to borrow $1,100, and delivered to the bank the note signed by himself and wife, and had the amount placed to his credit. The next day both checks indorsed by Conrad were by him presented at the bank and were paid, the amount charged to plaintiff's account, and the checks in due course returned to the plaintiff, marked paid. The plaintiff, to support his testimony that he had paid

$2,300 for the note, put the checks in evidence, and also a receipt signed by Conrad acknowledging the receipt of $100 in cash as part payment of the note. The purchase of the note was the only transaction had between the plaintiff and Conrad. Conrad does not deny receiving both checks, or that both were indorsed and presented by him, or that he received the money on both, or that both were given for the note; nor does he deny giving the receipt for $100 in cash, or that he received the money as evidenced by it and as part payment of the note and as recited in the receipt. The manifest and undoubted weight of the evidence shows that the plaintiff paid $2,300 as testified to by him, and as shown by his undisputed checks and the receipt, and not but $2,100, as deposed by Conrad, who, it seems, without explanation, deposed that was all he got for the note because that was all he accounted to his principal. So clear is the evidence as to the amount paid that a specific finding that the plaintiff had paid but $2,100 could hardly be permitted to stand. There is as much —exactly the same—evidence that the plaintiff gave the $200 check as part payment of the note, and that it was presented by Conrad and paid to him, as that the plaintiff gave the $2,000 check for that purpose, and that it was presented and paid. We think it, however, immaterial whether the plaintiff paid $2,300 or $2,100, for neither is such an inadequate price as to raise a presumption of knowledge of some infirmity in the note.

We thus, upon the evidence, have this situation: The plaintiff, without notice of any infirmity in the note, in good faith, on the morning of December 2d, gave Conrad, in exchange for the note, two checks, one for $200, and one for $2,000, with the request that the latter be not presented until the next day. Both were presented the next day and paid. After the exchange of the note for the checks, and before they were presented or paid, and before the $2,000 check was to be presented as requested, the plaintiff learned of the infirmity. He then could have stopped payment on the checks before they were paid, but did not do so, and completed his arrangement with the bank to obtain sufficient funds with which to meet the payment of the checks. Upon

these facts the defendant asserts the plaintiff did not acquire
title as a holder in due course, and did not purchase in good
faith for value and without notice. By our statute (Comp.
Laws 1907, Section 1604), so far as material, it is provided
that a holder in due course is a holder who took the instru-
ment ''in good faith and for value,'' and ''that at the time it
was negotiated to him he had no notice of any infirmity in
the instrument or defect in the title of the person negotiating
it''; that (section 1606) ''when the transferee receives no-
tice of any infirmity in the instrument or defect in the title
of the person negotiating the same before he has paid the
full amount agreed to be paid therefor, he will be deemed a
holder in due course only to the extent of the amount there-
tofore paid by him;'' and (section 1611) that ''every holder
is deemed prima facie to be a holder in due course; but when
it is shown that the title of any person who has negotiated
the instrument was defective, the burden is on the holder to
prove that he or some person under whom he claims acquired
the title as a holder in due course.'' The case chiefly turns
upon the question of payment. It is argued that the giving of
the checks was not payment until they were presented and
paid; and, since the plaintiff, before they were paid, learned of
the infirmity in time to have stopped payment, he had notice
before he had ''paid the full amount agreed to be paid,'' and
hence was not protected, except to the extent of the $100 paid
by him in cash. To support this the defendant relies on
*Crandall* v. *Vickery,* 45 Barb. (N. Y.) 156, where it was held
that the plaintiff there was not a purchaser in good faith for
value. There checks had been given in exchange for a note
with the understanding or agreement that they were not to
be presented for payment, but to be returned to the plaintiff
when money was wanted, and new checks to be given in lieu
of them. While the first checks were outstanding, the plain-
tiff learned of the infirmity in the note. Thereafter the out-
standing checks unpresented and unpaid were returned, and
new checks given, which were presented and paid. The court,
as it stated, looked beyond the mere form to the real trans-
action.

"Looking at it in this view," said the court, "it is seen that it was

not contemplated by the parties, or intended, that these checks then given should ever be presented or paid. They were never, in fact, presented, and nothing was ever advanced on them. The money was paid on other checks, substituted for the first, according to the arrangement first made. At the time, therefore, when the plaintiff was fully notified of the fraud, he had only these checks outstanding, which were not to be presented, but which were to be returned to him at a future day. * * · * The first checks, therefore, were not intended to create an * * * unconditional liability against the plaintiff. It was not expected they would be presented, or their payment enforced. The whole transaction at that time rested in this loose executory agreement, to be performed at some future time, altogether uncertain in the minds of the parties. It seems to me plain from this that nothing valuable had been·parted with by the plaintiff at the time the notice was given. The real obligations upon which the money was advanced were given long afterwards, and at a time when their date and presentment and payment would afford the plaintiff no protection."

The Supreme Court of the United States, in *Dresser* v. *Construction Co.*, 93 U. S. 95, 23 L. Ed. 815, in referring to that case, said:

"It was .held that he (the plaintiff in *Crandall* v. *Vickery*) was not a *bona fide* holder, for the reason that the transaction was executory when he received notice of the fraud; * * * that the real obligations were given afterwards, and under circumstances that afforded no protection"

—and that the checks given before notice of the fraud were not, nor intended to be, the consideration for the note.

The reason for which the transaction in *Crandall* v. *Vickery* was held to be executory was not because checks had been given in exchange for the note, but because the first checks were not, nor intended to be, at any time presented or paid, but to be returned and exchanged for other checks; and, since the latter, and not the former, were the real obligations and the real consideration for the note, and since the holder, before such exchange and substitution of checks, had notice of the infirmity, he was not protected. For these reasons we think the case of *Crandall* v. *Vickery* not analogous to this.

Other cases are cited by the defendant to the effect that the giving of a check for a pre-existing debt, or for goods sold and delivered, does not constitute payment, if the check, on

presentation and in due course, is dishonored or not paid, in which case the debt is not discharged or the goods sold may be reclaimed. Authorities also are cited to the effect that a purchaser of property by giving his non-negotiable note or security is not protected as a bona fide purchaser for value, if, before he actually paid the note or security, he had notice of the infirmity in the title (2 Pom. Eq. Jur. (3d Ed.), section 751), and some that he is not protected though he gave a negotiable note, unless negotiated so as to cut off defenses to the note in the hands of the original payee. *Davis* v. *Ward*, 109 Cal. 186, 41 Pac. 1010, 50 Am. St. Rep. 29. But as to this see *Bank* v. *Shaw*, 14 S. D. 197, 84 N. W. 779.

This case, as we think, rests upon different principles. True, a check, unless expressly agreed to be absolute payment, is but conditional payment; the condition being that upon presentment in due course it will be honored and paid. If it be given for a pre-existing debt, but upon presentment in due course is dishonored and not paid, of course, the debt as to the person receiving the check is not discharged. If, on the other hand, it is paid, then the debt is discharged, and payment relates back, so far as regards the extinguishment of the indebtedness, to the time when the check was given. 22 A. & R. Ency. L. (2d. Ed.) 573. The rule of conditional payment is, however, in the interest of the person receiving the check, and not of the person giving it. As to the former, it is not payment unless paid, or unless he expressly accepted it as absolute payment. As to the latter, it is payment when he delivers it, though it be dishonored and not paid, if the person receiving it chooses not to complain, or, nevertheless, to regard it as payment. If given for a pre-existing debt, and is not paid, the person receiving it may treat the indebtedness discharged and sue on the check, or he may treat the indebtedness as not discharged, and sue on the debt, or he, as affecting himself merely, may do neither, and call "things square." The law requires taxes to be paid in money; the collector may decline to receive anything but money in payment of them. If, however, he accepts a taxpayer's check, unless he takes it as absolute payment, he takes it on the condition that it, on presentment in due course, will be paid. If,

when so presented, it is not paid, the taxes are not paid; if it is, then the taxes also are paid, and payment relates back to the time when the check was delivered. Payment in such case is equivalent to cash payment. Further, the rule also is quite well settled that an exchange of commercial paper, notes, checks, or bills is a sufficient consideration, one for the other. In such an exchange each note or check is an independent obligation not conditioned on the payment of the other, unless such condition is expressed in it; but nonpayment of the other obligation may be available as a set-off between the original parties. 7 Cyc. 710. Upon such an exchange the particular transaction between the parties is consummated, and is not executory merely; each party becoming a holder for a valuable consideration. *Rice* v. *Grange*, 131 N. Y. 149, 30 N. E. 46. Says Daniel in his book on Negotiable Instruments (6th Ed.) Vol. 1, section 187:

"Where one has given his own note in purchase of the note of another from the payee, notice to him by the maker not to pay his note given in purchase, and that the bought note originated in fraud, does not deprive him of the character of a *bona fide* holder for value, and he need pay no attention to such notice."

A case in point, as we think, is *Matlock* v. *Scheuerman*, 51. Or. 49, 93 Pac. 823, 17 L. R. A. (N. S.) 747. There Scheuerman, on the 12th day of December, gave his check to one Swaggart. It was given for a gambling debt. Matlock, who had no knowledge of that, received it from Swaggart on the 13th in exchange for his (Matlock's) check. Swaggart told him that Scheuerman had asked him "to wait two or three days" before presenting Scheuerman's check, but that he (Swaggart) needed the money. Thereupon Matlock stated he would give, and gave, his check for it. Matlock, on the morning of the 14th, presented the Scheuerman check for payment. Payment was refused, and Matlock then notified by the bank that Scheuerman had stopped payment. Swaggart did not present Matlock's check until the next day, the 15th, when, upon presentment by him, it was paid. When payment on the Scheuerman check was refused, Matlock had ample time to have stopped payment of his check before it was presented, but did nothing to ascertain whether it had

been presented or paid; nor did he even notify Swaggart of nonpayment. He immediately gave the Scheuerman check to his attorney for collection. It was there contended that the giving of the Matlock check for the Scheuerman check was not payment until the former was paid, or had passed into the hands of an innocent purchaser for value, and, since before it was presented and paid Matlock received notice in time to have stopped payment, and having made no effort to do so, he was not a good faith purchaser for value. The court said:

"If defendant's theory is correct as to what constitutes payment, and when it took place, then Matlock received notice of an infirmity in the instrument before he paid value, and he would be bound at his own peril to stop payment of his own check. But we have already held that, where there is an exchange of commercial paper, as there was in this case, each instrument is a sufficient consideration for the other, and such exchange is an independent obligation, not conditioned on the payment of the other, unless such condition is expressed in it. It necessarily follows that the non-payment of the Scheuerman check would not be a defense to Matlock in an action against him on his own check brought by Swaggart," and would only be available by way of set-off. "As between Matlock and the bank, he could doubtless have stopped payment of his own check when denied the Scheuerman check, but that would not have relieved him of liability on his own check, either in the hands of Swaggart or of a third party as assignee. While Matlock may have had a cause of action against Swaggart, as an indorser upon due notice to him of non-payment, he is also entitled to his action against Scheuerman, and he was not bound to pursue the former for the protection of the latter, to whom he was under no legal duty on account of the original invalidity of the check."

Notice affecting the holder must exist at the time he acquires title; for then his relation to it is fixed. But, if notice is received before he pays for the paper, although the contract has been entered into, he is not on a footing of a bona fide holder without notice; if he paid a part before notice, he is protected only to that extent. Daniel (6th Ed.) Section 789a. That also is the statute. Hence the important factor here, as in the Matlock Case: "What constituted payment, and when was it made?"

To constitute payment to protect a purchaser the consideration, of course, need not be money—cash paid. It may consist of anything constituting a valid consideration of sufficient value. Giving or surrendering that is as much payment as money paid.

Where, as here, negotiable checks are exchanged for a negotiable note when each is an independent obligation and a sufficient consideration for the other, the purchaser has made payment when the instruments are delivered and the exchange is complete, unless, as in the case of *Crandall* v. *Vickery, supra,* the checks were not, nor intended to be, the consideration for the note, or unless, as in that case, the real transaction constituted nothing more than a mere executory agreement or promise to pay at some future time. Of course, as to Conrad receiving the checks, they were not payment until paid, unless expressly accepted as absolute payment. But when paid, payment, even as to him, related back to the time when the checks were delivered. Upon such an unconditional and completed exchange the transaction is consummated upon the delivery of the papers, and the rights and obligations of the parties fixed, which cannot be affected by any subsequent notice.

Much is made of the request that the $2,000 check be not presented on the day it was delivered, but on the next day. From that it is argued that the real transaction shows a mere promise or agreement to pay in the future. The fact is relevant to consideration and good faith; but the conclusion is not maintainable. The transaction has no element of a mere offer, promise, or of a mere executory agreement to pay in the future. As said in the Matlock Case, *supra*:

The request "was not binding on the payee. It did not vary the terms of the writing. It added nothing to it and took nothing from it that was essential to its character as a negotiable instrument. From such a request one would usually and rightly infer that the maker had not funds on deposit to meet the check when issued, but would deposit sufficient funds within the time, and, by the use of such language, notice of that fact might be given; but it is not calculated to carry notice of any infirmity in the contract."

We are of the opinion that the plaintiff acquired title as a

holder in due course, and therefore the judgment should be affirmed.

Such is the order; costs to respondent.

FRICK, J.

I concur. At the time of the argument, and before a careful and thorough examination of the authorities, I was strongly inclined to the opinion that the mere giving of the checks by the respondent did not constitute payment for the note in question. The authorities, however, do not support that opinion. The cases that must control here, as pointed out by Mr. Justice STRAUP in the prevailing opinion, are clearly to the effect that, where one person issues his negotiable check in exchange for negotiable paper, such check, for the purpose of protecting the purchaser, constitutes payment for such paper; and if the check be given in good faith before maturity of the paper, and without notice of any infirmity therein, the giver of the check, ordinarily at least, is a holder in due course, and may enforce payment of the paper, although he may receive notice of some infirmity therein before the check is actually paid by the bank or person on whom it is drawn. The courts make a clear distinction between transactions relating to the purchase of commercial paper and those relating to property generally, whether real or personal, and it would be futile to attempt to explain away the distinction. Nor is it of any consequence that, in my judgment, there should be no such distinction. It is my duty to declare the law as I find it, and not as I should like to have it. As was said by an eminent jurist in *Stack* v. *N. Y., etc., Railroad,* 177 Mass. 158, 58 N. E. 687, 52 L. R. A. 328, 83 Am. St. Rep. 269, so may it still be said:

"No one supposes that a judge is at liberty to decide with sole reference even to his strongest convictions of policy and right. His duty in general is to develop the principles which he finds, with such consistency as he may be able to attain."

This is especially true of appellate judges. My conviction and judgment, therefore, are important only where there is a diversity of opinion as to the law or facts, or in applying the conceded or found facts to the law. When the authorities

have spoken, therefore, it is as much my duty to follow and abide by them as it is the duty of any citizen. Moreover, in Oregon the same negotiable instruments act is in force which is in force in this jurisdiction. One of the principal objects in view in adopting that act by the several states was to bring about uniformity in the law relating to negotiable instruments. Where that law has been construed, therefore, by a court of competent jurisdiction, I conceive it my duty to follow such construction. If the constructions placed upon the law are not uniform, the law will cease to be so, and the principal purpose for which it was enacted fails. For the reasons so ably stated by Mr. Justice STRAUP, which I need not refer to nor repeat here, the judgment should be affirmed.

McCARTY, C. J.

I dissent. Comp. Laws 1907, section 1606, provides:

"When the transferee receives notice of any infirmity in the instrument or defect in the title of the person negotiating the same before he has paid the full amount agreed to be paid therefor, he will be deemed a holder in due course *only to the extent of the amount theretofore paid by him.*" (Italics mine.)

When Miller learned of the infirmity in the note, namely, that it had been obtained by Conrad from Marks by fraud, he had paid but $100 on the purchase price of the note. Now, if the foregoing section of the statute means what it says—and I submit that it does—Miller is entitled to recover "only to the extent of the amount" paid by him before he had notice of the fraud by which Conrad procured the execution of the note by Marks. Miller, at the time he delivered his two checks to Conrad, did not have sufficient funds in the bank on which they were drawn to pay them. It was agreed between them that the checks would not be presented to the bank for payment until the following day, and that in the meantime Miller would make provision to have sufficient funds in the bank to pay the checks when presented. I have not been cited to, nor have I been able to find, an authority that holds that the giving and acceptance of a check under such circumstances is a completed transaction and unconditional payment of the

property received therefor. It would, however, be a work of supererogation to cite the numerous authorities that sustain a contrary position. Miller received notice—had actual knowledge—two hours after he delivered the check to Conrad that the transaction in which Conrad obtained the note was impregnated with fraud. At the time Miller received notice of the fraud, as stated, he had paid but $100 on the purchase price of the note. His checks held by Conrad had not been, and would not be paid until the following day. Miller, therefore, had ample time and opportunity to protect himself before the checks were presented to the bank for payment. The payments made by Miller on the purchase price after he received notice of the fraud were made under circumstances which, under the great weight of authority, afford him no protection. A question similar to the one under consideration was involved in the case of *Dresser* v. *Missouri, etc., R. R. Const. Co.*, 93 U. S. 92, 23 L. Ed. 815. That was an action to recover on three promissory notes the aggregate amount of which was $10,000. The defense interposed was that the notes were obtained by fraud. The plaintiff claimed to have purchased the notes under an oral agreement and that the money should be paid therefor as required. He paid $500 on the purchase price before he received notice of the fraud. The trial court instructed the jury that:

"If the fact of fraud be established, and the jury find from the evidence that the plaintiff paid $500 upon the notes without notice of the fraud, and that after receiving notice of the fraud the plaintiff paid the balance due upon the notes, he is protected only *pro tanto;* that is, to the amount he paid before he received notice."

This instruction was approved by the Supreme Court on appeal. In the course of the opinion the court says:

"The notes in question were purchased upon an unexecuted contract, upon which $500 only had been paid when notice of the fraud and a prohibition to pay was received by the purchaser. The residue of the contract on the part of the purchaser is unperformed, and *honesty and fair dealing require that he should not perform it; certainly that he should not be permitted, by performing it, to obtain from the defendants money which they ought not to pay. As to what he pays after notice, he is not a purchaser in good faith. He then pays with knowledge of the fraud, to which he becomes a consent-*

*ing party.* .One who pays with knowledge of a fraud is in no better position than if he had not paid at all. He has no greater equity, and receives no greater protection. Such is the rule as to contracts generally. * * * The plaintiff here occupies the same position as the *bona fide* purchaser of the first of a series of notes, of which, after notice of a fraud, he purchases the rest of the series. He is protected so far as his good faith covers the purchase, and no farther. Upon receiving notice of the fraud, his duty was to refuse further payment; and the facts before us required such refusal by him. * * * The case before us is governed by the rule that the portion of an unperformed contract which is completed after notice of a fraud is not, within the principle which protects a *bona fide* purchaser. No respectable authority has been cited to us sustaining a contrary position, nor have we been able to find any." (Italics mine.)

The court cites with approval the case of *Crandall* v. *Vickery,* 45 Barb. (N. Y.) 156 (this case is also cited and briefly discussed by Mr. Justice STRAUP in the foregoing prevailing opinion), and says:

"That case is stronger for the holder than the case before us, in the fact that the checks were there given on the original transaction, *which might have been presented or passed off* to the prejudice of the maker." (Italics mine.)

So in this case Conrad might have "presented or passed off the checks to the prejudice of the maker" immediately after he received them; but he did not do so. If a third party had purchased the checks from Conrad in good faith without any knowledge of the fraud, a question quite different from the one before us would be presented. This case and the Crandall Case, I think, in principle are identical. The contract in each case was, at the time the maker of the checks received notice of the fraud, executory. In some respects *Crandall* v. *Vickery* is a stronger case for the holder than is the case at bar. In that case the drawer had sufficient funds in the bank to pay the checks first issued, and doubtless the checks would have been paid if they had been presented, in which case Crandall would have been a *bona fide* holder. In this case Miller, when he delivered the checks to Conrad, did not have sufficient funds in the bank to meet them. It appears that the amount of the checks exceeded his credit at the bank $1,100. There

is no assurance whatever that the check for $2,000 would have been cashed by the bank if it had been presented before the $1,100 was deposited by Miller to the credit of his account; and I think, under the circumstances, the presumption may be fairly indulged that the bank would not have honored the larger of the two checks if it had been presented on the day it was issued.

I am clearly of the opinion that, under the circumstances, good conscience and fair dealing required of Miller, when he learned of the fraud, to notify the bank not to pay either of the checks. Having failed to do this, he ought not to be permitted to recover from Marks any sum of money in excess of the $100, with interest thereon, that he paid before he received notice of the fraud.

The case is clearly distinguishable from the case of *Matlock* v. *Scheuerman*, 51 Or. 49, 93 Pac. 823, 17 L. R. A. (N. S.) 747. In that case it does not appear that Matlock ever learned that the Scheuerman check was given for a gambling debt until the filing of the answer in which it was alleged that the consideration for the check was a gambling debt.