## WINN et al. v. ROMNEY.

No. 4003.   Decided November 14, 1923.   Rehearing Denied February
7, 1924.   (222 Pac. 709.)

1. DESCENT AND DISTRIBUTION—EVIDENCE HELD TO SUSTAIN JUDG-
MENT REQUIRING TRUSTEE TO DISTRIBUTE INTESTATE'S PROPERTY
AMONG BROTHERS AND SISTERS EQUALLY. In an action by de-
ceased's brothers and sisters to compel deceased's brother, as
trustee, to divide the estate equally among them all as against
his claim to 25 per cent. under the terms of an oral trust,
undisclosed except to him, evidence *held* to sustain judgment
for plaintiffs.

2. PLEADING—PLEADINGS NOT ALWAYS TREATED AS ADMISSIONS
BINDING ON PARTY. It would be unfair to always treat state-
ments or denials in a pleading as binding admissions since
clients ordinarily, though sometimes imprudently attach their
signatures to pleadings proposed by their counsel without care-
ful scrutiny and counsel oftentimes, especially in the early
pleadings of a case; misconceive the real cause of action or
defense.

3. TRUSTS—TRUSTEE'S ORIGINAL ANSWER DENYING EXISTENCE OF
TRUST DID NOT CONCLUSIVELY SHOW DISINGENUUSNESS OF
AMENDED ANSWER SETTING IT OUT. In an action to compel
intestate's brother and trustee to divide her property equally
among her brothers and sisters, his original answer denying
the existence of the trust did not conclusively show disingenu-
ousness of his later amended answer setting it up.

Appeal from District Court, Third District, Salt Lake
County; *Wm. M. McCrea*, Judge.

Action by Eveline R. Winn and others against William
S. Romney.   Judgment for plaintiffs, and defendant appeals.

AFFIRMED.

*Ray Van Cott*, of Salt Lake City, for appellant.

*Ray & Rawlins*, of Salt Lake City, and *H. D. Folsom, Jr.*,
of Seattle, Wash., for respondents.

THURMAN, J.

Jane Agnes Romney, a spinster resident of Los Angeles, Cal., died intestate in that city May 6, 1918, leaving estate therein and in the state of Utah of the approximate value of $40,000. About $3,500 of her estate was situated in California and the remainder in Utah. Her father, George Romney, of Salt Lake City, Utah, who was living at the time of her death, was her sole heir at law, and it appears both from the pleadings and the evidence that prior to his death, which occurred February 1, 1920, he created a trust covering the entire estate of Jane Agnes in accordance with her desires and wishes expressed before her death.

The fact that a trust was created in which the defendant, who was her brother, was named as trustee, is not in dispute. The only question is: Who were the beneficiaries of the trust and what was the share of each?

It is contended by defendant that after the payment of expenses incident to administering her estate, divers sums were to be distributed to certain nephews, nieces, and charities, and the residue divided among her brothers and sisters of the full blood as follows: 25 per cent to the defendant and the remainder among her other brother and sisters of the full blood in equal shares, "share and share alike."

The contention of plaintiffs is that after the payment of administration expenses the residue of the estate was to be divided equally among all her surviving sisters and brothers of the full blood, "share and share alike."

The terms of the trust rest in parol. They were never disclosed in detail by George Romney, except to defendant, during his lifetime; nor did the defendant ever disclose his version of the trust until a few days before the commencement of the trial in December, 1922, when he did so by filing an amended answer to plaintiff's complaint.

The purpose of this action is to determine the terms, conditions, and limitations of the trust and for a decree declaring the same and for other equitable relief.

The court, to whom the cause was tried without a jury, found the issues in favor of the plaintiffs, and judgment was

entered accordingly. The defendant appeals and assigns as error practically every finding of the court. However, it will not be necessary to consider the assignments of error in detail, as they all relate to the question as to what were the terms, conditions, and limitations of the trust.

No controverted question of law is involved. As above indicated, it is a question of fact pure and simple. Its determination necessarily calls for a somewhat careful consideration of the evidence. The trial court having found the issues in favor of the plaintiffs, the sole question is: Are the findings contrary to a clear preponderance of the evidence?

There is no conflict as to many of the essential facts. Some of them already appear in the foregoing statement. For the purpose of elimination others will now be stated.

George Romney, the father of deceased, Jane Agnes Romney, was a polygamist, resided in Salt Lake City, and had three wives. Jane Agnes was a daughter of the first wife and had six sisters and two brothers of the full blood, to wit, Eveline R. Winn, Georgina R. Brain, Ella R. Brain, and Barbara Folsom (plaintiffs herein), also Elizabeth R. Anderson, Clora Thorup, George Ernest Romney and William S. Romney, the defendant. These are the only persons at all interested in this litigation.

Jane Agnes Romney, the deceased was bitterly opposed to polygamy and was more or less inimical to the "Mormon" church. She moved from Salt Lake City to Los Angeles 25 or 30 years before her death and was said to be a Christian Scientist or at least more or less inclined towards the faith and doctrines of that denomination. Her brother William S., defendant herein, visited her frequently at her home in Los Angeles, transacted more or less business for her, especially concerning her estate in Utah, and appears to have been her confidential adviser in matters relating to business. In the summer of 1917 the defendant visited her at her home in Los Angeles, and before leaving Salt Lake City he was requested by his father, George Romney, to ascertain from Jane Agnes what her desires were respecting the disposition of her property in the event that she died before her father.

At that time she was 64 years of age and her father 86. It appears that the defendant, in the visit referred to, did interview Jane Agnes respecting the disposition of her property and communicated to her the fact that her father desired to know her wishes in that respect.

In this connection, it may be stated once for all that notwithstanding George Romney would be the sole heir of Jane Agnes in the event that he survived her, it does not appear that he had any desire whatever concerning her property except to dispose of it according to her express desire. It appears that she communicated her wishes to the defendant during the visit referred to, and as to one feature at least there is no controversy between the parties. She desired that her brothers and sisters of the full blood should be the only children of her father who should participate in the distribution of her estate. In other words, she did not desire that his children by his other wives should succeed to any of her estate, assigning as a reason therefor that they would succeed to the estates of their mothers, who had been amply provided for by her father, and that as her own mother had long since been deceased without leaving property it was only fair that her brothers and sisters of the full blood should succeed to her estate. Whatever may be the fact as to the exact details concerning her desires as expressed to the defendant relating to the disposition of her property, it is fair to presume that on that occasion she made a full disclosure of such desires and requested him to communicate the same to her father. It appears that for some reason she did not care to make a will, but trusted implicitly that her father would respect her wishes. On his return home defendant immediately communicated to his father the result of his interview with Jane Agnes, and his father stated that her wishes would be respected and faithfully observed. He charged defendant to see that they were carried out, and defendant then and there accepted the trust.

As already stated, Jane Agnes died May 6, 1918. On the 13th of the same month her father, George Romney, executed a relinquishment of all his claim to the estate of Jane Agnes, upon the express understanding that the estate be divided

as she had indicated to William S. Romney (the defendant),
but provided that the expenses, amounting to approximately
$1,500, should be first deducted. At the time that the re-
linquishment was executed by George Romney, he again en-
joined upon William the duty of faithfully executing the
trust. I have already stated that the exact terms, condi-
tions, and limitations of the trust were not disclosed by
George Romney, except to defendant, in his lifetime; nor did
the defendant state his version of its terms and conditions
until a few days before the trial in December, 1922. Thus
it will be seen that such disclosure was not made by defend-
ant until more than five years after Jane Agnes communi-
cated her desires; more than four years after her death, and
nearly three years after the death of George Romney.

In the meantime, after the death of Jane Agnes, her
brothers and sisters of the full blood, understanding that
their father had succeeded as sole heir to her estate, and
believing as did Jane Agnes that such brothers and sisters
should succeed thereto, conferred among themselves concern-
ing the matter. There is evidence tending to show that at
some time in October, 1918, at the request of defendant, all
of the brothers and sisters of Jane Agnes of the full blood,
except Eveline R. Winn and Elizabeth R. Anderson, who
were absent from the state, met at the home of L. E. Cluff,
a relative by marriage, in Salt Lake City, for the purpose of
formulating some kind of petition to their father, George
Romney, who was still alive, to divide the estate of Jane
Agnes among her own brothers and sisters. There is also
evidence tending to show that at that meeting the defendant,
W. S. Romney, expressed the desire that the estate of Jane
Agnes should be equally divided among her brothers and
sisters of the full blood. It appears that a petition was
prepared, addressed to their father, George Romney, and
signed by all present, including the defendant, to the effect
that the petitioners desired the estate to be equally divided
among the children of their mother. The evidence also shows
that the petition was given to the defendant to deliver to
their father. As to the contents of the petition and whether

or not it was signed by defendant or given to him to deliver to his father, there is some conflict between the testimony of the plaintiffs and that of the defendant. He admits being at the meeting and understood that the object was to petition their father to see that none of the estate of Jane Agnes should go to the children of the other wives. As to the other matters, he either did not remember or denied them absolutely.

In any event, it appears that on November 13, 1918, shortly after the meeting above referred to, George Romney executed two assignments of the estate of Jane Agnes, one for the estate in California and the other for the estate in Utah. Both assignments were to the effect that he was the sole heir to the estate of Jane Agnes Romney and that he waived all right, title, and interest in and to the said estate and petitioned the court to distribute all of the estate to William S. Romney, brother of deceased. One of the assignments was filed in the superior court of Los Angeles, Cal., and the other in the district court of Salt Lake county, Utah. The record shows that almost immediately after these assignments were executed and filed the defendant caused administration of the estate in California to be commenced, and the same was concluded and final distribution of the property made to defendant by order of the court on July 26, 1919. The record further shows that during the latter part of the year 1919 the defendant divided the estate distributed to him by the California court as follows: $50 each to five nephews of deceased Jane Agnes Romney, on account of thir having served their country as soldiers in the World War. The remainder, after payment of expenses incident to the administration, was divided equally between the eight brothers and sisters of the full blood of Jane Agnes Romney, deceased. It appears that this division was made during the lifetime of George Romney, who, as before stated, died on February 1, 1920.

In addition to the facts and circumstances above enumerated, there is evidence in the record to the effect that defendant told one or more of the brothers and sisters referred to

that he thought his father would turn the estate over to their mother's children.

The evidence is conclusive that defendant, although often requested, refused at all times to disclose to his brother and sisters the terms and conditions of the trust, especially after the death of his father. It is in evidence that towards the last he gave some of them to understand that it was none of their business what he did with the property. The reason assigned by the defendant for refusing to disclose the terms of the trust was, as stated by him, that his father had requested him not to divulge it until the time came for distribution; that it might cause him some annoyance by members of the other families who were not beneficiaries under the trust.

It also appears from the record that defendant filed his petition for letters of administration of the estate in Utah, in the district court of Salt Lake county, in January, 1920, and was thereafter duly appointed as administrator of the estate; that up to the date of the trial, in December, 1922, after filing his bond, he had never done anything further towards administering the estate.

The foregoing and many other circumstances unnecessary to enumerate in detail and relied on by plaintiff's as tending to support their contention as to the terms and conditions of the trust.

The defendant's testimony is generally to the effect that in his interview with Jane Agnes at Los Angeles in the summer of 1917 she expressed the desire that if her father survived her he would give to her nephews who entered the World War, as a token of her appreciation of their patriotism, the sum of $50 each. She also desired that two of her nieces in Los Angeles, who were poor and needy and who had been kind to her, should be remembered. The amounts suggested were $1,200 and $800 respectively. She also expressed a desire, if possible, to give $2,000 to charities. Defendant suggested to her three charitable institutions in Salt Lake City—L. D. S. Hospital, Sarah Daft Home, and St. Ann's Orphanage. She agreed to this, and then, as to the residue, she said, in effect, that defendant had always been considerate

and kind toward her and she wanted him to have two or three times as much as any of the others. Defendant figured it up and suggested 25 per cent. to him and 75 per cent. to the other brother and sisters, to which she agreed. Defendant testified he communicated these instructions to his father, and his father said they "should be carried out to the letter" and enjoined upon defendant the duty of seeing that it was done according to her wishes. Elizabeth R. Anderson, sister of deceased, Jane Agnes and mother of Grace and Pearl, the two nieces heretofore referred to, testified for defendant to the effect that after Jane Agnes died and before she was buried she had a conversation with her father in which he stated in substance that it was nothing but right that Grace and Pearl should have some share in Jane Agnes' estate and that he had instructed William to that effect.

There are many fragments of evidence disclosed by the record which tend in some slight degree to sustain the contention of each of the parties plaintiff and defendant. We have not deemed it necessary to devote time and space to a detailed statement of these fragments, for after all, the controlling features of the evidence are as above set forth.

The trial court had the opportunity of seeing the witnesses, hearing their testimony, and noting their demeanor on the stand. It arrived at a definite conclusion, after what appears to have been a painstaking effort to ascertain the truth. Were it not for this, the writer confesses that he would regard it as an exceedingly close case and one that is more than ordinarily difficult to determine. The character and reputation of the defendant in the business world, together with the esteem in which he was evidently held by the deceased, Jane Agnes Romney, as well as by his father, who was himself a man of high standing in the business world, would ordinarily be sufficient to cause a fair-minded man to give credence to any statement he might make in ordinary business affairs. Besides this, there are some features of the case calculated in their nature to appeal to the mind of the court as strongly corroborative. For instance: It seems quite consistent with what we know of

human nature and human affairs to believe that Jane Agnes Romney, who had lived in Los Angeles for more than a generation, remote from her brothers and sisters in Utah, should remember her nieces in Los Angeles, who were needy and poor, and who had been kind to her, in her loneliness, and considerate of her welfare, especially when those nieces were the daughters of the only sister she had in Los Angeles, where she made her home. It is equally consistent, as I view the case, that she would make some discrimination in favor of the defendant, her brother, who frequently visited her at her home, transacted business for her, had been custodian of her stocks and securities in Salt Lake City, and in whom the indubitable evidence shows she had the most implicit confidence. Considerations such as these, to say the least, are somewhat baffling to the mind of the court in attempting to arrive at a just conclusion; but, on the other hand, much can be said on the other side. If it was the desire of Jane Agnes that her nieces should be the recipients of her bounty and she so communicated to the defendant, and through him to her father, the question arises: Why was the distribution not made to them out of the Los Angeles estate? Why was not at least a partial distribution made to them out of the estate in Los Angeles, in view of their unquestioned poverty and need? Or, if it was inconvenient to make the distribution out of the Los Angeles estate, why was it not made long ago out of the Utah estate? There is nothing in the record which affords a satisfactory answer to these questions, which to the mind of the writer are exceedingly pertinent.

As pertaining to the case in its entirety, many questions might be asked which are not satisfactorily answered by the evidence in the case. Why did the defendant remain silent as to the terms and conditions of the trust when his brother and sisters were importuning him through all the years to disclose such terms and conditions? Why, in October, 1918, did he join with them in petitioning his father to make an equal division of the property among the deceased's brothers and sisters of the whole blood if at that time he knew that the trust provided for a distribution to collateral kindred

and an unequal distribution of the remainder in his own favor? If it be true that he kept silent as to the terms and conditions of the trust at his father's request, to safeguard him against annoyance and importunity by other members of his family, why remain silent after the death of his father when the reason for silence had ceased to exist?

Another feature of the case relied on by plaintiffs as being of peculiar significance is the fact that when defendant distributed the residue of the Los Angeles estate he divided it equally among the brothers and sisters of the whole blood, share and share alike. He did not at that time discriminate in his own favor by retaining 25 per cent, while distributing to the others only 75 per cent.; nor did he intimate to any of them that he was conferring upon them a favor by temporarily waiving his full share until the final distribution of the estate in Utah. It is contended by plaintiffs that the reason why defendant made an equal distribution of the Los Angeles estate is because at that time George Romney, the only other person who knew the exact terms of the trust was still alive. Whatever may be the fact concerning this feature of the case, it must be conceded that it is somewhat significant in support of plaintiffs' contention.

There are other features of the case more or less inconsistent with defendant's contention. Just why Jane Agnes Romney, who had lived in Los Angeles for the greater part of her life, who was more or less inimical towards the "Mormon" church, who was also a Christian Scientist, presumably having no belief in the utility of hospitals as instrumentalities for the comfort and welfare of persons sick and afflicted, should desire to endow the Latter-Day Saints Hospital of Salt Lake City with the sum of $1,000 taxes human credulity to the utmost. The same reasons against the donations to the other charities in Salt Lake City do not exist to the same extent, and yet it is somewhat singular that such donations were intended in view of the fact that all of the charitable institutions mentioned must have come into existence after she became a resident of California. It is true, as appears from the evidence, the suggestion as to these donations was made to Jane Agnes by the defendant himself,

and because of her confidence in his judgment and integrity she may have acquiesced. But be that as it may, the fact remains that from the summer of 1917, when defendant received his instruction from Jane Agnes, until December, 1922, when he filed his amended answer, a period of more than five years, no one, unless it was the defendant's father, ever heard of these contemplated contributions to charity, and there appears to be no human reason why the fact, if it be a fact, was not disclosed and the charities dispensed according to the donor's intentions.

There is one other point of more or less significance vigorously urged by the plaintiffs. In his original answer to plaintiffs' complaint filed September 25, 1922, three months before the trial, defendant denied the existence of any trust whatever. This point is relied on as indicating the disingenuousness of defendant concerning the trust alleged in his amended answer filed a few days before the trial. If this were the only point in the case, the court would not be inclined to regard it as of controlling importance. Pleadings are usually framed by attorneys, and clients ordinarily,    **2, 3** though sometimes imprudently, attach their signatures to pleadings proposed by their counsel without careful scrutiny as to their actual contents. Besides this, counsel oftentimes, especially in the early pleadings of a case, misconceive the real cause of action or defense and perhaps desire to raise some technical question, on its face incompatible with the actual facts. For these reasons it would be unfair to always treat statements or denials in a pleading as binding admissions when offered as evidence in the case.

The record is replete with evidence as to the high character of defendant in his business associations. This feature has been referred to heretofore. If his version of the trust is true, it is a fact to be regretted that he has placed himself in an unfortunate situation and by his whole course of conduct justified the court in finding against his contention.

In view of the record which we have carefully examined, we are not justified in holding that the findings are against the clear preponderance of the evidence.

Judgment affirmed at appellant's cost.

WEBER, C. J., and GIDEON, CHERRY, and FRICK, JJ., concur.

## On Application for Rehearing.

PER CURIAM.   Appellant, in his application for rehearing, makes the point that the court in its opinion failed to pass upon appellant's assignment of error challenging the right of the trial court to incorporate in the bill of exceptions the trial court's "memorandum of decision."

The assignment was not given express notice in the opinion, principally because it was without merit.   The authorities referred to by appellant (*Utah Commercial & Savings Bank* v. *Fox*, 44 Utah, 323, 140 Pac. 660, and *Miller* v. *Marks*, 46 Utah, 257, 148 Pac. 412) do not hold that it is error to include the opinion of the trial court in a bill of exceptions.   The effect of the court's holding in the cases referred to is that when the opinion of the trial court is incorporated in the bill it is properly before this court, but has no judicial effect; nevertheless it is said the opinion "may be looked to to ascertain the judge's reason for his decision."

The further suggestion is made that this court in its decision gave great weight to the trial court's "memorandum of decision."   We can conceive of no excuse for such suggestion other than that we felt it our duty to affirm the judgment after a most careful consideration of all the evidence.

Appellant's principal contention is that the evidence preponderates in favor of appellant.   That was his main contention before the opinion was written.   Upon that question appellant has made a masterful presentation, and one which challenged further consideration of the facts.

This opinion has been delayed in order that every member of the court might have ample opportunity to again review the evidence.   We have done so, conscientiously, and find no reason for changing our opinion.   While admitting that the question is exceedingly close, and for that reason difficult to determine, yet we are unanimous in the conclusion that we

are not warranted in holding that the findings of the trial court are against the clear preponderance of the evidence. That being the case, our duty is clear, whatever might have been our opinion had we been triers of the facts.

The application for rehearing is denied.