Decided February 4, 1908.

## MATLOCK v. SCHEUERMAN.

[93 Pac. 823.]

[17 L. R. A. (N. S.) 747]

BILLS AND NOTES—CHECKS—ACTIONS—DEFENSES—ILLEGALITY—BURDEN
OF PROOF.

1. Under Section 1945, B. & C. Comp., providing that all notes, bills, etc.,
the consideration for which is money won at gaming with cards, etc., shall be
void as between the parties thereto and all other persons, except holders in
good faith, without notice of the illegality of the contract, where, in an ac-
tion on a check by the indorsee thereof, it was admitted by the pleadings
that the check was given for a gambling debt, plaintiff had the burden of es-
tablishing all the elements necessary to constitute him a holder in good
faith for value.

SAME—NEGOTIABLE INSTRUMENT.

2. Under Section 4454, B. & C. Comp., providing that one is a holder in due
course of a negotiable instrument who has taken the instrument under the
following conditions:  "That it is complete and regular on its face,"—the fact
that at the time a check was transferred, the payee stated that the drawer
had asked him to wait two or three days for presentation of the check, did not

charge the indorsee with notice of any infirmity in the contract, such a request not being binding on the payee, and not varying the terms of the writing.

SAME—PRESENTATION—TIME.

3. As between the drawer and payee of a check the rule is, that when the payee to whom the check is delivered receives it in the same place where the bank on which it is drawn is located, he may preserve recourse against the drawer by presenting it for payment at any time before the close of banking hours on the next day.

SAME—PAYABLE ON DEMAND—OVERDUE.

4. Under Section 4455, B. & C. Comp., providing, that where an instrument payable on demand is negotiated an unreasonable length of time after its issue, the holder is not deemed a holder in due course, a check issued on a certain date, and bearing that date and negotiated at noon of the following day, was not overdue, so as to carry to the indorsee notice of its illegality or previous dishonor.

SAME—RECEIPT IN USUAL COURSE OF BUSINESS.

5. Commercial paper may be said to be received in the usual course of business, when it is indorsed and delivered for value under such circumstances that a business man of ordinary intelligence and capacity would give his money, goods, or credit for it, when offered for the purpose for which it is transferred; and it would not be in due course, if he should at once suspect the integrity of the paper itself, or the credit and standing of the party offering it.

SAME—QUESTION FOR JURY.

6. A purchaser for valuable consideration before maturity of negotiable paper, is not as a matter of law affected by notice of facts calculated to arouse suspicion as to the transaction in which the paper originated, the single question being whether he acted in good faith; and in determining that question his knowledge of suspicious circumstances may be shown, and it is for the jury to determine the ultimate facts.

SAME—NOTICE OF INFIRMITY—SUFFICIENCY OF EVIDENCE—

7. Under Section 4458, B. & C. Comp., providing that to constitute notice of infirmity in a negotiable instrument, or defect in the title of the person negotiating it, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith; evidence that the transfer of a check for $400 by S., the payee thereof, to plaintiff, his brother-in-law, took place near the bank on which the check was drawn and of which plaintiff was vice-president; that no inquiry was made at the bank before purchase; and that plaintiff, after getting his lunch, went to a hotel, got a blank check, and filled it out to the order of S. for $400, and gave it to another party for delivery to S.—did not show actual knowledge on plaintiff's part of an infirmity in the check.

GOOD FAITH—QUESTION FOR JURY.

8. Where, in an action on a check by the indorsee thereof, an inference may be drawn from the surrounding circumstances that on the one hand tends to discredit plaintiff's testimony as to his lack of knowledge of the infirmity of the check and his good faith in taking it, and on the other hand, tends to establish lack of good faith, the question is for the jury.

PAYMENT—CHECK OF DEBTOR—PRESUMPTION.

9. When a debtor gives his check for the amount of his indebtedness, the *prima facie* presumption arises that the check was taken merely as condi-

tional, not as absolute payment, though to make the rule applicable, there must be a debt either precedent or contemporaneous.

BILLS AND NOTES—EXCHANGE OF COMMERCIAL PAPER—PAYMENT AS CONDITION.

10. Where there is an exchange of commercial paper, each instrument forms a sufficient consideration for the other, and such exchange is an independent obligation not conditioned on the payment of the other, unless such condition is expressed in it.

SAME—HOLDER IN DUE COURSE—CONSIDERATION.

11. Section 4454, B. & C. Comp., relating to negotiable instruments, provides that one is a holder in due course "who has taken the instrument under the following conditions: * * That he took it in good faith and for value." Section 4427 provides, that value is any consideration sufficient to support a simple contract. One S., the payee of a check drawn by defendant, told plaintiff that defendant had asked him to wait two or three days before presenting it, and that he (S.) might need some money. Plaintiff agreed to take the check, which was thereupon indorsed to him, he giving S. his own check for a like amount. This latter check was afterwards paid. *Held*, that plaintiff gave value for the check indorsed to him.

SAME—ACTIONS—INSTRUCTIONS.

12. Defendant gave his check to one S. in payment of a gambling debt. S. indorsed the check to plaintiff, who took it without notice of its illegality, and gave his own check for a like amount, and on the same bank, in exchange therefor. *Held*, that an instruction that plaintiff was not bound to make inquiry at the bank, or ascertain whether or not his check had been presented or paid at the time he presented defendant's check for payment, nor was it necessary for him to stop payment on his own check, if, at the time he presented defendant's check for payment, he was a *bona fide* holder thereof, and that the fact that his own check had not yet been cashed would make no difference, was proper.

SAME—RIGHTS OF INDORSEE—INVALIDITY OF CHECK.

13. A *bona fide* indorsee for value of a check given for a gambling debt is not bound on discovering the original invalidity of the check to sue the indorser, rather than the maker.

From Umatilla: HENRY J. BEAN, Judge.

Statement by MR. COMMISSIONER SLATER.

Defendant appeals from a judgment entered against him for the amount of a check issued by him, under date of December 12, 1906, on the First National Bank of Pendleton, for the sum of $400, in favor of Lester Swaggart, his order, or bearer, who about noon of the following day indorsed and delivered it to plaintiff, receiving in exchange therefor plaintiff's check for the same amount, on the same bank, payable to his order.

It is averred in the complaint that plaintiff paid Swaggart value for the check, and on the 14th presented it to

the bank for payment, which was refused on the order and direction of defendant, given to the bank without plaintiff's knowledge, and after he became the owner of it. The answer admits the issuance of the check, but denies the other averments of the complaint, and affirmatively alleges that the only consideration for the check was a gambling debt which Swaggart claimed from defendant; that Swaggart, on the morning of the 13th, before he indorsed it to plaintiff, had presented the check for payment, which was refused; that plaintiff had knowledge of its illegality when he received the check, and of its previous dishonor; that plaintiff paid no consideration or value for the transfer; and that at the time of the transfer the check was past due. By the reply all of the new matter of the answer is denied excepting that the check was given for a gambling debt. Error is assigned on account of the overruling of defendant's motion for a nonsuit, the admission of testimony over his objection, and the giving and refusing of instructions by the court.                                    AFFIRMED.

For appellant there was a brief and an oral argument by *Mr. Douglas W. Bailey.*

For respondent there was a brief and an oral argument by *Mr. James H. Raley.*

Opinion by MR. COMMISSIONER SLATER.

1. All the errors assigned are included in two principal propositions, which alone are necessary to be considered, viz.: (1) Is the plaintiff a holder in due course? and (2) was he under any legal duty to stop payment on his own check, after having been denied payment of the check held by him? The statute declares that one is a holder in due course, "who has taken the instrument under the following conditions: (1) That it is complete and regular upon its face; (2) that he became the holder of it before it was overdue, and without notice that it had been previously dishonored, if such was the fact; (3) that he took it in good faith, and for value; (4) that at the

time it was negotiated to him he had no notice of any infirmity in the instrument, or defect in the title of the person negotiating it": B. & C. Comp. § 4454. But a check, the consideration for which is money won by playing at a game of cards, is void and of no effect as between the parties to the same, and all other persons, except holders in good faith, without notice of the illegality of such contract: B. & C. Comp. § 1945.

It having been admitted by the pleadings that the check was given in consideration of a gambling debt, the burden of proof is with the plaintiff to establish all of the elements necessary to constitute him a holder in good faith for value: *Owens* v. *Snell*, 29 Or. 483 (44 Pac. 827) ; *Kenny* v. *Walker*, 29 Or. 41 (44 Pac. 501) ; *Brown* v. *Feldwert*, 46 Or. 363 (80 Pac. 414). The check sued on was offered in evidence, and is in the following form:

"Pendleton, Oregon, Dec. 12, 1906.   No. ——
The First National Bank                    $400.——
                                                         order
Pay to L. Swagard                          or bearer
Four Hundred Dollars
                                                J. Scheuerman."

Plaintiff testified that he had lived in Pendleton for 30 years and had been acquainted with Scheuerman for 20 years; that he was a man who did a great deal of business about town, of which plaintiff had more or less knowledge; that he had frequently seen defendant's checks in circulation in the community, and now held one of them, and that he, plaintiff, was the present owner and holder of the check sued on; that he bought the check from Swaggart, who at the time indorsed the same to him; that no part of the check had been paid, and that he, plaintiff, gave his check for $400 for it, and that his check, so given to Swaggart, was cashed at the First National Bank, and the amount charged to his account by the bank; that within two or three days after he got Scheuerman's check he demanded payment thereof of the

First National Bank, but was told by the cashier that Scheuerman had stopped its payment; that at the time he paid Swaggart for the check he had no knoweldge as to what the consideration of the Scheuerman check was, nor that it was given for a gambling debt, nor that the maker and payee thereof had been engaged in gambling. On cross-examination the witness also testified that he bought the check on December 13, 1906, about noon. In answer to the question, "Tell the jury the circumstances under which you bought it?" plaintiff testified as follows:

"That day about 12 o'clock I was going home to my lunch, and I met Mr. Swaggart on the corner of the Boston store, and he stopped me and said, 'I have a check of Scheuerman's which he asked me to wait two or three days for, and I may need the money,' and I said: 'All right. Give me the check, and I will give you my check for it, and you can go to the bank and get the money.' And he signed the check, and I went to my lunch and came back ·from lunch, and went to the hotel and got a blank check and gave it to John Endicott."

Knowing that Endicott was well acquainted with Swaggart, he asked him to hand the check to the latter, which he did. Endicott, it appears, had been interested with Swaggart in the results of the gambling game; but plaintiff swears he knew nothing of that. The plaintiff's evidence further shows that he is vice-president of the First National Bank, and was in the bank on the morning of the 13th, but he did not then learn that Scheuerman had ordered payment on his check stopped; that he presented the check at the bank for payment on the morning of the 14th, which was refused; that he made no inquiry at the bank to ascertain whether the check he had issued to Swaggart in exchange therefor, had been paid or not, nor did he notify Swaggart of the nonpayment of the Scheuerman check, but he immediately gave it to his attorney for collection; that on the 15th Swaggart cashed at the bank the check received by him

from plaintiff. Upon this state of the record, has plaintiff made out a *prima facie* case of a holder in due course? We shall discuss in the order of their statement in Section 4454, B. & C. Comp., the several elements of fact, the existence of which is necessary to constitute one a holder in due course.

2. It is necessary that the instrument be complete and regular on its face, and it is argued by the defendant that Swaggart's remark at the time of the negotiation that Scheuerman had asked him to wait two or three days for presentation of the check, disclosed to plaintiff that the instrument did not represent on its face, all of the contract between the parties and rendered it indefinite as to time of payment. Such a request, however, was not binding on the payee. It did not vary the terms of the writing. It added nothing to it and took nothing from it that was essential to its character as a negotiable instrument. From such a request one would usually and rightly infer that the maker had not funds on deposit to meet the check when issued, but would deposit sufficient funds within the time, and, by the use of such language, notice of that fact might be given; but it is not calculated to carry notice of any infirmity in the contract.

3. It is urged that the check was overdue when negotiated. It is payable on demand, and when such paper is negotiated an unreasonable length of time after issue, the holder is not deemed a holder in due course: B. & C. Comp. § 4455. What is a reasonable time has been fixed by judicial decisions. As between the drawer and payee the rule is that, when the payee to whom the check is delivered receives it in the same place where the bank on which it is drawn is located, he may preserve recourse against the drawer by presenting it for payment at any time before the close of banking hours on the next day: 2 Daniel, Neg. Inst. (5 ed.), § 1590.

4. The presumption raised by the statute is, that if the instrument is presented within a reasonable time it would be paid, if a valid instrument on its face; but, when such reasonable time has passed and the instrument is still in circulation, it carries with it the inference of dishonor, and is notice to any one taking it of any latent inherent infirmity that may exist. The check having been issued on the 12th, and bearing that date, and negotiated at the noon hour on the 13th, was not overdue, so as to carry notice to plaintiff of its illegality or of its previous dishonor.

5. It is next urged that the check was not received in the usual course of business, but in a very unusual manner, not in the course of a business transaction, or a transaction free from suspicion. As to what transactions are included "in the usual course of business" it is not easy to determine. That depends largely upon the circumstances of each particular case: 7 Cyc. 925. As applied to the indorsement of commercial paper, it may be said generally to include the concurrent indorsement and delivery for value under such circumstances that a business man of ordinary intelligence and capacity would give his money, goods, or credit for it when offered for the purpose for which this was transferred, and it would not be in due course if such a person would at once suspect the integrity of the paper itself, or the credit and standing of the party offering it: 2 Randolph, Commercial Paper, § 988; *Roberts* v. *Hall,* 37 Conn. 205 (9 Am. Rep. 308) ; *Kimbro* v. *Lytle,* 10 Yerg. (Tenn.) 417 (31 Am. Dec. 585). This necessarily involves the question of good faith.

6. But a purchaser for a valuable consideration, before maturity of negotiable paper, is not as a matter of law, affected by notice of facts calculated to arouse suspicion as to the transaction in which the paper originated. The single question is, whether he acted in good faith, and to aid in determining that question his knowledge of

suspicious circumstances may be shown, and it is for the jury to determine the ultimate facts: *Bowman* v. *Metzger,* 27 Or. 23 (39 Pac. 3: 44 Pac. 1090).

7. Since the decision of that case the legislature has prescribed a rule upon what shall constitute notice in such cases:

"To constitute notice of an infirmity in the instrument or defect in the title of the person negotiating the same, the person to whom it is negotiated, must have had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith": B. & C. Comp. § 4458.

The lack of good faith arises, it is asserted, from the facts shown that the transfer took place in the near vicinity of the bank on which the check was drawn, and of which Matlock was vice-president; that he and Swaggart were brothers-in-law; that no inquiry was made at the bank before purchase; that Matlock after getting his lunch, went to the hotel, and there procured a blank check in which he wrote the amount of $400, payable to Swaggart and signed and delivered it to Endicott for delivery to Swaggart. But none of these facts amount to proof of actual knowledge.

8. As to making the inquiry "he does not owe to the party who puts such paper in circulation the duty of active inquiry to avert the imputation of bad faith. The rights of the holder are to be determined by the simple test of honesty and good faith, and not by mere speculation as to his probable diligence or negligence": *Belmont Branch Bank* v. *Hoge,* 35 N. Y. 65-68; *Bowman* v. *Metzger,* 27 Or. 23 (39 Pac. 3: 44 Pac. 1090). Plaintiff testified to his lack of knowledge of the infirmity of the paper and to his good faith in taking it; but if an inference may be drawn from the surrounding circumstances that on the one hand, tends to detract from the credibility of plaintiff's statements, and on the other hand, tends to establish the lack of good faith, it is for the jury and not the court to determine the fact.

9. Did the plaintiff take the instrument for value? Value is any consideration sufficient to support a simple contract: Section 4427, B. & C. Comp. It is a well-settled and universally recognized rule that, when a debtor has given his check for the amount of his indebtedness, the *prima facie* presumption arises that the check was taken merely as conditional, not absolute payment (22 Am. & Eng. Ency. Law [2 ed.], 569), and "the acceptance of the instrument by the creditor is considered as accompanied by the condition of payment. Thus it was said, in the time of Lord HOLT: 'A bill shall never go in discharge of a precedent debt, except it be a part of the contract that it shall be so'": 2 Daniel, Neg. Inst. (5 ed.), 283. And this rule has been applied to the liquidation of a contemporaneous debt: 2 Daniel, Neg. Inst. (5 ed.), 281.

There must, however, be a debt, either precedent or contemporaneous, to make the rule applicable.

10. Where, however, there is an exchange of commercial paper, each instrument forms a sufficient consideration for the other (2 Randolph, Commercial Paper, §§ 479-480; *Rice* v. *Grange,* 131 N. Y. 149 (30 N. E. 46); *Rankin* v. *Knight,* 1. Cin. R. (Ohio) 515; *Shannon* v. *Harley,* 32 Misc. Rep. 623 (66. N. Y. Supp. 471), and each is an independent obligation not conditional on the payment of the other (7 Cyc. 710).

11. In this case the language of the parties used at the time imports nothing more than an exchange of checks. They met upon the street, when Swaggart says to plaintiff: "I have a check of Scheuerman's which he asked me to wait two or three days for, and I may need the money." Plaintiff replies: "All right. Give me the check and I will give you my check for it, and you can go to the bank and get the money." That is the contract between the parties. It appears from other evidence that the Scheuerman check which was then indorsed and delivered to plaintiff was for the sum

of $400, and that Matlock gave to Swaggart his check for a like amount.  The transaction does not amount to an offer to pay $400 and its acceptance, thereby creating a debt of that amount, which was afterwards liquidated by the delivery of another check.  If, however, that construction should follow, the check would have the effect of conditional payment, and it is a part of the plaintiff's case that the check he gave was paid on the 15th.  That not only established its value, but is a performance of the condition.  The original obligation is paid and extinguished by relation as of the date of the giving of the check: *Hunter* v. *Wetsell,* 84 N. Y. 549 (38 Am. Rep. 544) ; *Getchell* v. *Chase,* 124 Mass. 366; *Cushman* v. *Libbey,* 15 Gray (Mass.), 358.  As sustaining the contention that the check was not payment, we are cited to the case of *Heartt* v. *Rhodes,* 66 Ill. 351-356. There one Dickinson gave his check to pay a precedent debt, existing in the form of a note signed by Heartt for his accommodation, and on which the action was brought.  At the time of giving the check Dickinson had only $23.40 in the bank, and the check was dishonored for want of funds.  Because of the pre-existing debt, the rule of conditional payment was applicable, and the court very properly say:

"Drawing the check without having funds to meet it, and having no right to expect payment of it, was a fraud and imposition on the payee."

For the same purpose the case of *Harrington* v. *Johnson,* 7 Colo. App. 483 (44 Pac. 368), is cited.  There one Hoblit, who was the cashier of a bank, purchased of the mortgagee a note and mortgage, which had been fraudulently given, and gave a check on his bank for the price.  A suit in equity was brought to set aside the conveyance for fraud, and the defense of *bona fide* purchaser for value was set up.  Fraud was found; but the lower court held that Hoblit purchased without notice,

and that by giving his check he had paid value. On appeal the case was reversed upon the ground that Hoblit was entirely silent as to what became of the check; whether it was ultimately paid, or whether, in point of fact, Mrs. Johnson, the assignor, ever received the money which it represented. He neither produced the check or proved its payment, and hence there was no evidence of value. *Thompson* v. *Sioux Falls National Bank,* 150 U. S. 231 (14 Sup. Ct. 94: 37 L. Ed. 1063) is another case upon which defendant relied. It was there held, that the crediting upon the books of the bank to a depositor of the amount of a check fraudulently issued without consideration, and to whom it was assigned, does not make the bank a *bona fide* purchaser for value, and that if, after such credit and before payment for value upon the faith of the check, the holder receives notice of the invalidity of the check, he cannot become a *bona fide* holder by subsequent payment. This is undoubtedly correct, because by such credit only the relation of debtor and creditor is created, and it is the right of the apparent debtor at any time upon receipt of knowledge of the invalidity of the check, to cancel the credit, but if it pays, having such knowledge, it is a voluntary payment. We conclude, therefore, that there was no error in denying defendant's motion for a nonsuit.

12. The theory of the defense is that the giving of a check by Matlock to Swaggart was not payment and did not amount to payment until Matlock's check was paid at the bank on which it was drawn, or it had passed out of Swaggart's hands and into the hands of an innocent purchaser. An instruction to that effect was asked, but was denied; and the court instructed the jury:

"That the plaintiff was not bound to make inquiry at the bank, or ascertain whether or not his check had been presented or paid at the time he presented the Scheuerman check for payment. Neither was it necessary for plaintiff to stop payment on his check, if at the time he presented the check to the bank for payment he was a

*bona fide* holder thereof. The fact that his own check had not yet been cashed would make no difference."

And error is also assigned for the refusal to give and the giving of these instructions. If defendant's theory is correct as to what constitutes payment, and when it took place, then Matlock received notice of an infirmity in the instrument before he paid value, and he would be bound at his own peril to stop payment of his own check. But we have already held that, where there is an exchange of commercial paper, as there was in this case, each instrument is a sufficient consideration for the other, and such an exchange is an independent obligation, not conditioned on the payment of the other, unless such condition is expressed in it. It necessarily follows that the non-payment of the Scheuerman check would not be a defense to Matlock in an action against him on his own check brought by Swaggart. "It is true," as stated in *Wooster* v. *Jenkins,* 3 Denio (N. Y.), 187:

"That so long as the securities are in the hands of the original parties they will balance each other. But it is by way of set-off, and not on the ground that they are invalid."

Even the defense of set-off would be lost by assignment of the check. As between Matlock and the bank, he could doubtless have stopped payment of his own check, when denied payment of the Scheuerman check, but that would not have relieved him of liability on his own check, either in the hands of Swaggart or of a third party as assignee.

13. While Matlock may have had a cause of action against Swaggart, as indorser upon due notice to him of non-payment, he is also entitled to his action against Scheuerman, and he was not bound to pursue the former for the protection of the latter, to whom he was under no legal duty on account of the original invalidity of the check. In *Duncan* v. *Gilbert,* 29 N. J. Law, 521, action was brought on a note made for the accommoda-

tion of one Rowland, and which, it was alleged as a defense, had been fraudulently misappropriated by him, and a letter of credit on London obtained from plaintiff in his favor as the consideration for its assignment. The suggestion was made to the court that plaintiff might revoke the letters of credit and thus protect themselves, to which BROWN, J., at page 540 of opinion, replies, in substance, that, if it be said that Rowland has not drawn, the plaintiffs may protect themselves from future drafts by revoking the credit; the answer is, the plaintiffs cannot be called upon by defendant to adopt that remedy. There was no error in refusing the requested instruction, or in the one given.

The court permitted the jury to consider all of the surrounding circumstances given in the evidence, which included plaintiff's failure to notify Swaggart of the nonpayment of the defendant's check, and his failure to demand and enforce payment against Swaggart, to ascertain plaintiff's good faith in taking the check. We think that is all that defendant was entitled to, and there was no error in refusing the other requested instructions, not specifically considered herein.

These considerations, we think, dispose of the errors assigned, and result in an affirmance of the judgment.

AFFIRMED.