Motion to dismiss appeal denied July 27, 1915.
Argued on the merits September 26, reversed November 21, 1916.

## EVERDING & FARRELL v. TOFT.*

### (150 Pac. 757; 160 Pac. 1160.)

**Appeal and Error—Decisions Reviewable—Part of Judgment.**

1. Sections 549, 550, L. O. L., declare that any party to a judgment or decree, not rendered by confession or for want of an answer, may appeal therefrom, or from some specified part. In an action on a note brought against several, the answers of the several defendants raised different issues. There was judgment in favor of one of the defendants and against the others. *Held* that, while the statute does not authorize a party to maintain separate appeals from different parts of a judgment, yet in such case plaintiff might appeal from that part of the judgment in favor of one of the defendants.

**Bills and Notes—Indorsement—Rights of Holders.**

2. The perpetration of fraud will not alone defeat the holder of a negotiable instrument, but it must be supplemented by a notice to the holder.

**Bills and Notes—Indorsement—"Holder in Due Course."**

3. Under Section 5885, L. O. L., defining a holder in due course, a person is not a holder in due course if he does not take the note in

---

*As to the question of evidence of fraud or illegality in the inception of the instrument, see notes in 10 L. R. A. (N. S.) 679; 17 L. R. A. 328; 36 L. R. A. 434.

As to effect of exchange of commercial title to constitute one a holder in due course for value, see note in 17 L. R. A. (N. S.) 747.

Upon the question as to what knowledge of consideration by purchaser of a note which did not indicate the nature of its consideration is required by statute, see notes in 24 L. R. A. (N. S.) 1057; 29 L. R. A. (N. S.) 351; 42 L. R. A. (N. S.) 395.          REPORTER.

good faith without notice of any infirmity in the instrument or affecting the title of the person negotiating it.

**Bills and Notes—Indorsement—Notice of Defects.**

4. A person who takes a note has notice of an infirmity in the instrument or defect in the title if he had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith.

**Bills and Notes—Indorsement—Bad Faith of Indorsee—"Negligence"—"Bad Faith."**

5. While negligence is not synonymous with bad faith, yet where a person takes a note under suspicious circumstances and, having means of knowledge, willfully abstains from making inquiries, his intentional ignorance may result in bad faith.

[As to parol evidence to vary effect of indorsement, see note in 7 Am. St. Rep. 366.]

**Bills and Notes—Actions—Questions for Jury.**

6. The question of good or bad faith of the holder of a note is peculiarly for the jury and not for the court, especially when the burden rests on the holder to show that he became the holder in due course.

**Bills and Notes—Actions—Burden of Proof.**

7. Under Section 5892, L. O. L., providing that when it is shown that the title of any person who has negotiated an instrument was defective, the burden is on the holder to prove that he or some person under whom he claims acquired title as a holder in due course; when a note had its origin in fraud, the burden is on the owner to prove that he or some person under whom he claims was a holder in due course.

**Bills and Notes—Actions—Admissibility of Evidence.**

8. In an action by an indorsee on a note for $5,000, evidence that the plaintiff acquired the note for $4,000 is admissible, especially in connection with information received by plaintiff as to one indorser and inquiries made or omitted concerning other indorsers and the maker, as bearing on the question whether the holder was chargeable with bad faith.

**Bills and Notes—Actions—Admissibility of Evidence.**

9. A person may resort to circumstantial evidence to show that the owner of a negotiable instrument is not a holder in due course.

**Bills and Notes—Actions—Question for Jury.**

10. In an action by an indorsee on a note, evidence *held* to present a question for the jury as to the good faith of the plaintiff.

**Bills and Notes—Actions—Issues and Proof.**

11. Where a complaint on a note charges a defendant with being an indorser in due course of business, he cannot be held liable as a maker or guarantor.

**Bills and Notes—Liabilities of Parties—"Primarily Liable"—"Secondarily Liable."**

12. Under Section 6023, L. O. L., providing that the person who by the terms of an instrument is absolutely required to pay is primarily

liable and all other parties are secondarily liable, the maker of a note is primarily liable while the indorser is secondarily liable.

**Bills and Notes—Indorsement—"Discharge" of Indorser.**

13. Section 5953, subdivision 3, L. O. L., declaring that a person secondarily liable on an instrument is discharged by discharge of a prior party, applies only to a discharge by act of the creditor, and does not include discharges by operation of law, nor where, after a trial on the merits, the note is destroyed because of a vice inherent in the transaction.

**Bills and Notes—Actions—Instructions.**

14. Where, after a trial on the merits, it is determined that because of fraud and notice there is no subsisting debt of the maker of a note, there is no debt of an indorser, and it is error to instruct that there may be a verdict in favor of the maker, but against the indorser.

From Multnomah: CALVIN U. GANTENBEIN, Judge.

This is an action by Everding & Farrell, a corporation, against John F. Toft, J. L. Hoffman and others. There was a judgment in favor of plaintiff against John F. Toft, and one against plaintiff in favor of J. L. Hoffman for his costs and disbursements. From that part of the judgment in favor of defendant Hoffman, plaintiff appeals. Respondent files motion to dismiss the appeal.               MOTION DENIED.

*Mr. Alfred E. Clark* and *Mr. Malcolm H. Clark,* for the motion.

*Messrs. Reed & Bell, contra.*

Opinion by MR. CHIEF JUSTICE MOORE.

This is a motion to dismiss an appeal. In order to understand the question involved, it is necessary to state the substance of the facts upon which a solution of the inquiry depends:

The defendant J. L. Hoffman on August 7, 1912, executed to the defendant the Colombian Timber Company, a corporation, his promissory note for $5,000, payable in one year, with interest at the rate of 8 per

cent per annum. Prior to the maturity of the instrument the defendants John F. Toft, John F. Shorey and the payee in due course indorsed the note for value, and thereupon the plaintiff Everding & Farrell, a corporation, became the owner thereof and instituted an action to recover the amount due thereon; the complaint being in the usual form. Toft, separately answering, denied some of the averments of the initiatory pleading, and for a further defense alleged that he was induced to indorse the note by the fraudulent representations of an agent of the payee, setting forth the statements asserted to be false; that before the plaintiff obtained title to the instrument one of its officers, naming him, was informed by Toft that there was something wrong about the making and indorsing of the note, and advised not to purchase it expecting this defendant to pay the same. The statements of new matter in this answer were denied in the reply.

The defendant Hoffman, separately answering, admitted most of the averments of the complaint, and further alleged that he was induced to execute the note to evidence the purchase of 5,000 shares of the capital stock of the defendant corporation, which its agent fraudulently represented was valuable, but in fact was valueless, and that prior to plaintiff's purchase of the written promise its officer was informed of the invalidity thereof, by reason of false statements, setting them out. A reply put in issue the averments of new matter in this answer.

The defendants, the Colombian Timber Company and John F. Shorey, did not appear or answer. The cause being tried on the issues joined, the plaintiff secured a judgment against Toft for the amount of the note, while the defendant Hoffman obtained a judgment against the plaintiff for his costs and disburse-

ments.   The plaintiff's attorneys served upon the defendants Toft and Hoffman a notice of appeal, which, omitting the title and the signatures, is as follows:

"You, and each of you, will please take notice that an appeal is taken by Everding & Farrell, the above-named plaintiff, to the Supreme Court of the State of Oregon from a part of that certain judgment made and rendered in the Circuit Court of the State of Oregon for the county of Multnomah on the 8th day of February, 1915, in that certain cause entitled 'In the Circuit Court of the State of Oregon for the County of Multnomah.   Everding & Farrell, Plaintiff, v. John F. Toft, Colombian Timber Company, a Corporation, J. L. Hoffman, and Jno. F. Shorey, Defendants, D. 7423.'   The part of the judgment from which the appeal is taken to the Supreme Court of the State of Oregon is specified in words and figures as follows, to wit: 'It is further ordered and adjudged that the plaintiff take nothing herein of or from the defendant J. L. Hoffman, and that the defendant J. L. Hoffman recover of and from the plaintiff his costs and disbursements herein, and that execution issue therefor.' "

The transcript having been filed in this court, counsel for the defendant Hoffman have interposed a motion to dismiss the appeal, on the grounds that a review of a part of the judgment only cannot legally be upheld, and that an execution on the judgment against Toft has been issued whereby some of his property has been sold and the proceeds thereof paid over to plaintiff.

Any party to a judgment or decree that was not given or rendered by confession or for want of an answer may appeal therefrom, "or some specified part thereof": Sections 549, 550, L. O. L.   In construing these sections of the statute it has been held that a party will not be permitted to maintain separate ap-

peals from parts of a judgment or decree. An apparent exception to this rule is recognized whereby an appeal will lie from a part of a judgment or decree, when an issue distinct, entire and complete has been formed between some of the parties, and upon which issue a final judgment or decree has been given, affecting only the interests and rights of the parties to that particular issue: *Bush* v. *Mitchell*, 28 Or. 92 (41 Pac. 155).

In the case at bar it will be remembered that distinct issues were made by the separate answers of Toft and Hoffman. Based on these issues, judgments were rendered, which final determinations, as between Toft and Hoffman, were as well defined as though they had been given in separate actions; and, this being so, the plaintiff could appeal from that part of the judgment specified in its notice. No appeal having been taken by the plaintiff from the judgment rendered against Toft, an estoppel cannot arise from any proceedings undertaken to enforce the determination as against him.

The motion must therefore be denied; and it is so ordered.        MOTION TO DISMISS DENIED.

———

Reversed November 21, 1916.

ON THE MERITS.

(160 Pac. 1160.)

Department 2.    Statement by MR. JUSTICE HARRIS.

The Colombian Timber Company is a corporation, and it will be mentioned by its name or as the timber company. Everding & Farrell is likewise a corpora-

tion, but it will be referred to either by its corporate
name or as the plaintiff. The Colombian Timber
Company sold 5,000 shares of its capital stock to J. L.
Hoffman who paid for it by executing a note for $5,000
dated August 7, 1912, payable one year after date to
the order of the timber company at the Merchants'
National Bank of Portland, Oregon. Everding &
Farrell purchased the note, on September 13, 1912,
from the Colombian Timber Company for $4,000.
When the paper was delivered to the plaintiff it bore
the indorsements of John F. Toft, the Colombian Tim-
ber Company and John F. Shorey in the order named.
Payment having been demanded and refused, the paper
was protested, and the plaintiff then commenced this
action to recover the full amount of the note, naming
as defendants J. L. Hoffman, the maker, and John F.
Toft, Colombian Timber Company and John F.
Shorey, the indorsers. The timber company and
Shorey defaulted. Hoffman and Toft filed separate
answers, each claiming that the plaintiff purchased the
note with knowledge of fraud. The complaint alleges
that Hoffman executed and delivered the note, and
that the paper was, "in due course of business, in-
dorsed by the defendants J. F. Toft, the Colombian
Timber Company, and John F. Shorey."

The defendant Toft defends by saying that W. E.
Douglas, as agent for the corporation, came to him
and "stated that the Colombian Timber Company was
trying to raise some money by making a sale of said
note, and as defendant John F. Toft was a business
man on Front Street, in Portland, Oregon, that if he
(Toft) would indorse said note that the Colombian
Timber Company could readily sell the same." The
answer continues by alleging that the corporation
through its officers, and especially through its stock

salesman, W. E. Douglas, represented that it owned logging equipment and machinery which could not be duplicated for less than $50,000, and that it owned a contract, "which will no doubt run into millions of dollars," to log and ship for a price of $50 per 1,000 feet board measure upward of 5,000,000,000 feet of mahogany and Spanish cedar timber located on the Martello estate, in the United States of Colombia, South America, and that for the purpose of raising funds with which to install "its machinery on the ground and commence actual operations of logging and shipping under the terms of its contract," it was offering to sell 50,000 shares of its treasury stock. Continuing, the answer recites that while acting for the Colombian Timber Company, Douglas represented that it owned property which was reasonably worth $50,000, and was free from encumbrances, and that Shorey was worth $100,000, and that the Hoffman note was accompanied by a negotiable instrument for $10,000 which was held as collateral security. After charging that all the representations were false and that he indorsed the note in reliance upon them, Toft alleges that the timber company offered to sell the Hoffman note to Everding & Farrell, and that afterward Thomas Farrell, who is a representative of the plaintiff, "interviewed the defendant John F. Toft as to the genuineness of said promissory note, and at said time the said Thomas Farrell asked [stated to] said John F. Toft that said note had been offered to him [Thomas Farrell] for $4,000, or $1,000 less than the face value thereof, and that he was thinking of purchasing the same, whereupon the defendant John F. Toft made the following statement to Thomas Farrell: 'If the Colombian Timber Company was offering you that note for $1,000 less than the face of

the note there is something wrong with it. It certainly doesn't look good to me. You better investigate it further. There would be no occasion to sacrifice this note if the statements made to me by W. E. Douglas, the agent of this company, which were that the company had property of the reasonable value of $50,000, and that John F. Shorey, the president of said company, was possessed of property of the reasonable value of $100,000 were true. There is something radically wrong about this transaction. You better be careful. I am going to investigate the matter myself. Don't buy this note expecting me to pay it, I never will.' "

Toft avers that notwithstanding the warning and information given by him the plaintiff "thereafter went and purchased said promissory note from the Colombian Timber Company," and consequently with "due notice that the note and indorsement by the defendant John F. Toft had been procured by fraud."

The answer filed by Hoffman sets forth that the timber company made false representations, substantially the same as those made to Toft, concerning the logging equipment, the timber contract, and the purpose for which the treasury stock was to be sold, but he goes further and alleges that "John F. Toft was at the time acting as agent of said defendant corporation" in the sale of its corporate stock, and that he conspired with W. E. Douglas, who was a stock salesman and promoted the sale to Hoffman, to induce a purchase of the stock, and told Hoffman that Douglas was reliable, and that "he [Toft] had carefully examined into the said proposition of defendant corporation, its properties and the value thereof, that it owned the properties" represented to be owned by it, and "that he had invested of his own money in the corpo-

rate stock in the said corporation the sum of $5,000,''
and ''that said capital stock was worth the par value
thereof''; and Hoffman then avers that Toft never in-
vested any sum in the capital stock, and that the only
stock ever received by him was as a commission for in-
ducing Hoffman to buy the 5,000 shares. Hoffman
says that he relied upon the fraudulent representations
of the corporation, and also upon the statements made
by Toft, and on that account purchased the stock and
gave his note. After stating that the plaintiff had
purchased the note at a discount of 20 per cent Hoff-
man then avers:

''That recently he has been informed, and therefore
alleges the fact to be, that prior to the purchase of
said note by plaintiff, plaintiff was warned that there
was something wrong about the note, and advised to
investigate the same; and that sufficient of the circum-
stances surrounding the transactions hereinbefore
alleged was brought to the knowledge of the plaintiff,
so that plaintiff was not and is not a purchaser for
value in good faith, without notice of the facts herein-
before set forth.''

Plaintiff replied to both answers by denying any
fraud or notice of the alleged infirmity in the note. A
trial resulted in a verdict in favor of the defendant J.
L. Hoffman, but at the same time the jury found for
the plaintiff and against the defendant Toft for the
full amount of the note. The plaintiff appealed from
that part of the judgment which was favorable to Hoff-
man, while Toft appealed from that portion which is
against him.                                    REVERSED.

For appellant, Everding & Farrell, there was a brief
over the name of *Messrs. Reed & Bell,* with an oral
argument by *Mr. C. A. Bell.*

For appellant, John F. Toft, there was a brief over the names of *Messrs. Malarkey, Seabrook & Dibble,* and *Mr. Walter G. Hayes,* with an oral argument by *Mr. Ephraim B. Seabrook.*

For respondent, J. L. Hoffman, there was a brief over the names of *Mr. Alfred E. Clark* and *Mr. Malcolm H. Clark,* with an oral argument by *Mr. Alfred E. Clark.*

MR. JUSTICE HARRIS delivered the opinion of the court.

The plaintiff appealed because the court: (1) Denied a motion to strike out all evidence relating to the charge of fraud; (2) refused to direct a verdict for the plaintiff; and (3) instructed the jury that "under the evidence in this case, you may find a verdict in favor of the defendant Hoffman, although you may find the plaintiff is entitled to recover against the defendant Toft." The appeal prosecuted by Toft is predicated upon the theory that the discharge of the maker of the note necessarily operates as a discharge of the indorser.

The nature of the questions involved in the two appeals makes it proper to take some notice of the testimony before attempting to discuss the assignments of error. The Colombian Timber Company issued a printed prospectus and employed W. E. Douglas to sell its capital stock. The prospectus stated that the timber company owned tools, machinery and equipment for logging, "and in fact complete equipment for the woods," which "could not be duplicated for less than $50,000," and that "the company also owns the contract for logging the property of the Fearon & Martello Company, the value of which cannot be estimated,

but which will no doubt run into millions of dollars.''
The prospectus recited that the timber company ''will
engage in the business of logging mahogany and Span-
ish cedar timber exclusively, and by virtue of a logging
contract which it holds covering upward of 5,000,-
000,000 feet of timber,'' and it is also represented
that ''the Colombian Timber Company offers for sale
50,000 shares of its treasury stock, fully paid and non-
assessable, at par, $1 per share. The funds realized
from the sale of this stock will be used to install its
machinery on the ground and commence actual opera-
tions of logging and shipping under the terms of its
contract as hereinbefore set forth.'' The statements
appearing in the prospectus were false. The timber
company did not own any logging tools, machinery or
equipment, nor did it own any logging contract. The
Colombian Timber Company owned practically noth-
ing except a few books and some stationery. Accord-
ing to the testimony of Hoffman his attention was first
directed to the Colombian Timber Company by Toft
who gave him a copy of the prospectus, ''and ex-
plained that it was a great proposition to invest money
in,'' and ''that he was going to invest $10,000 of his
own money, and he thought if I wanted to put any
money in, there was not a better proposition open.''
A few days afterward Toft introduced Hoffman to
Douglas, and, according to the testimony of Hoffman,
he was told by Toft that he could rely upon any state-
ments made by Douglas. Hoffman and Douglas then
went to the office of the timber company, and, after
being assured by Douglas that the statements in the
prospectus were true, Hoffman there, either at that
time or three or four days afterward, gave his note in
payment for the 5,000 shares of the capital stock which
he purchased. A note payable to Hoffman was deliv-

ered to the timber company as collateral security.
The next day a certificate for 500 shares of the capital
stock was issued in the name of Toft and delivered at
his place of business. Toft indorsed the note after it
was delivered to the payee, and on August 9, 1912, he
received from the Colombian Timber Company a cer-
tificate for 5,000 shares of its capital stock in payment
for his indorsement.

The plaintiff buys and sells "grains, salmon and the
like," and does not "make a business of buying and
selling notes on the market," although it loans "a
great deal of money." Everding & Farrell purchased
the note from the Colombian Timber Company for
$4,000. Before buying the paper Thomas G. Farrell,
who is the secretary of the plaintiff, and conducted the
negotiations for the purchase of the note, made in-
quiries at a bank concerning the financial standing of
Toft, and ascertained that the latter was "good for
any amount to $5,000"; he made no inquiries concern-
ing the timber company, but was told that Shorey was
"reputed to be worth a good deal of money"; he testi-
fied that he did not realize that the maker of the note
was the defendant J. L. Hoffman, because he "always
called him Joe," notwithstanding the fact that he had
known Hoffman for many years and had "asked Mr.
Toft who the man was, and he said he was a farmer
out here somewhere"; and he also told the jury that
the note was purchased because of the financial worth
of Toft and without knowing whether the maker "had
one dollar or a million."

Thomas G. Farrell had at least one and probably
two conversations with Toft before purchasing the
note. Toft testified that:

"Mr. Thomas Farrell came down and asked me if
I indorsed a note to the Colombian Timber Company

for $5,000. I stated that I had, and probably some other remarks were made, but nothing of any importance, and he went away. A few days later he came down and said they were offering the note for $4,000. I said, 'Tom, if such is the case, there is something wrong.' The statement made to me by Mr. Douglas was that the company owned property valued at $50,000, the president was worth $100,000, the vice-president was worth from $40,000 to $60,000, and that they were holding as collateral security a note for $10,000, and that if those facts were true, there would be no occasion to sell that note for $4,000, and he had better look into the matter; that I certainly should do it. * * "

Continuing, the witness also stated that before leaving Farrell said, "John, I might possibly have to call on you to pay the note"; and Toft replied by saying, "Tom never buy that note thinking I will ever pay it." Farrell denies the conversation as related by Toft, but the version given by the former need not be stated because the inquiry is now directed to whether there was any evidence to take the case to the jury.

Two or three months after the execution of the note Hoffman rceived a pamphlet which the timber company had recently issued, and upon noticing that no reference was made to logging equipment he went to the office of the Colombian Timber Company and ascertained for the first time that the representations concerning the logging equipment and contract were false, and that his note had been sold by the payee. He interviewed Toft and learned that Toft had indorsed the note "so they could realize on it," and that it had been purchased by Everding & Farrell.

The testimony of Toft is to the effect that Douglas gave him a copy of the prospectus, directed his attention to the printed statements concerning the logging equipment and the logging contract, and at that time

assured the witness that the representations appearing in the prospectus were true; that Douglas represented that the president of the Colombian Timber Company was worth $100,000; and that the vice-president was worth $40,000 or more. Toft also says that he was induced by the statements appearing in the prospectus and the representations made by Douglas to indorse the note for the purpose of giving credit to the paper, and he admits that he received 5,000 shares of stock for indorsing the note. Toft claims that he first suspected that the note might be tainted with fraud when Farrell informed him that the paper could be purchased for $4,000, and it was not until after that conversation that he ascertained the falsity of the statements printed in the prospectus and the falsehoods uttered by Douglas.

1. The defenses interposed by both the maker and the indorser involve two elements: (1) Fraud; and (2) notice to the plaintiff. The maker alleges that the note was induced by fraud, and the indorser avers that the indorsement was brought about by the same means. The perpetration of fraud will not alone defeat the holder of a negotiable instrument, but it must be supplemented by notice to the holder. In the final analysis, the correctness of the ruling on the motion to strike out the testimony relating to the fraud and on the motion for a directed verdict depends upon whether there was any evidence showing notice to the plaintiff when it acquired the note. Everding & Farrell bought the paper before maturity and is a holder in due course, unless the instrument was taken with knowledge of facts amounting to bad faith. There was evidence tending to show that the capital stock of the Colombian Timber Company was worthless, and that the issuance of the note was induced by false representations; and

it now becomes necessary to refer to the statute which defines what constitutes notice, and then to determine whether there is any evidence bringing the plaintiff within the rule.

2. A person is not a holder in due course if he does not take a note in good faith without notice of any infirmity in the instrument or defect in the title of the person negotiating it: Section 5885, L. O. L.

3. A person who takes a note has notice of an infirmity in the instrument or defect in the title to the paper if at the time he took the note he "had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith." Neither of the answering defendants argue that the plaintiff had actual knowledge of the alleged infirmity in the note itself or in the indorsement, and consequently the plaintiff did not take the paper with notice, unless it had knowledge of such facts that its action in taking the instrument amounted to bad faith.

4. The plaintiff argues that it did not have knowledge of any facts, and that at the most it only had notice of a suspicion or opinion on the part of Toft that possibly something was wrong with the note. The knowledge must be of such facts that the act of taking the instrument amounts to bad faith, and hence the ultimate inquiry is whether on account of the facts known to him the holder was guilty of bad faith. It may be conceded that knowledge of facts which are calculated to arouse the suspicions of an ordinarily prudent man does not as a matter of law constitute bad faith, nor does the owner of commercial paper necessarily forfeit the rights of a holder in due course merely because he neglected to make inquiries or failed to use the caution of that fictitious person known as the

"ordinarily prudent man": *Matlock* v. *Scheuerman,* 51 Or. 49, 56 (93 Pac. 823, 17 L. R. A. (N. S.) 747); *Triphonoff* v. *Sweeney,* 65 Or. 299, 305 (130 Pac. 979); *Bond* v. *Ellison,* 80 Or. 634 (157 Pac. 1103); *Bowman* v. *Metzger,* 27 Or. 23 (39 Pac. 3, 44 Pac. 1090); 3 R. C. L. 1072). As said in *Bowman* v. *Metzger:*

"It is the policy of the law to eliminate from the consideration of the jury the question of common prudence as the measure of good faith, and with it the question of negligence, except in so far as it may be taken as indicative of bad faith."

While negligence is not synonymous with bad faith, yet a person who takes a note under suspicious circumstances, and, having the means of knowledge, willfully abstains from making inquiries, then his intentional ignorance may result in bad faith, because the final question is one of honesty and good faith: 3 R. C. L. 1075; 8 C. J. 505; *Griffith* v. *Shipley,* 74 Md. 591 (22 Atl. 1107, 14 L. R. A. 405); *Bowman* v. *Metzger,* 27 Or. 23 (39 Pac. 3, 44 Pac. 1090); *Benton* v. *Sikyta,* 84 Neb. 808 (122 N. W. 61, 24 L. R. A. (N. S.) 1057); 7 Cyc. 946. Even though the existence of suspicious circumstances does not necessarily spell bad faith, and negligence is not a synonym for bad faith, and failure to make inquiries does not inevitably create an irresistible force which compels a finding of bad faith, nevertheless since the ultimate inquiry is one of honesty and good faith, it is competent to show the existence of suspicious circumstances, failure to make inquiries and want of prudence, and it then becomes the province of the jury to say whether a person taking with knowledge of those facts is guilty of bad faith: 8 C. J. 501, 502, 503; *Arnd* v. *Aylesworth,* 145 Iowa, 185 (123 N. W. 1000, 29 L. R. A. (N. S.) 638); *McPherrin* v. *Tittle,* 36 Okl. 510 (129 Pac. 721, 44 L. R. A. (N. S.) 395);

*Matlock* v. *Scheuerman,* 51 Or. 49 (93 Pac. 823, 17 L. R. A. (N. S.) 747); *Harrington.* v. *Butte & Boston Min. Co.,* 33 Mont. 330 (83 Pac. 467, 114 Am. St. Rep. 821); *Canajoharie Nat. Bk.* v. *Diefendorf,* 123 N. Y. 191 (25 N. E. 402, 10 L. R. A. 676); *Bowman* v. *Metzger,* 27 Or. 23 (39 Pac. 3, 44 Pac. 1090); 3 R. C. L. 1075.

5. The question of good or bad faith is peculiarly one for the jury and not the court, especially when the burden rests upon the owner of the note to show that he became a holder in due course: *Arnd* v. *Aylesworth,* 145 Iowa, 185 (123 N. W. 1000, 29 L. R. A. (N. S.) 638); *Union Investment Co.* v. *Rosenzweig,* 79 Wash. 112 (139 Pac. 874); *Rohweder* v. *Titus,* 85 Wash. 441 (148 Pac. 583).

6. Section 5892, L. O. L., provides that:

"When it is shown that the title of any person who has negotiated the instrument was defective, the burden is on the holder to prove that he, or some person under whom he claims, acquired the title as a holder in due course."

And, therefore, when it is shown that a note had its origin in fraud, the burden is then placed upon the owner to prove that he or some person under whom he claims acquired the note as a holder in due course: 3 R. C. L. 1039; *Matlock* v. *Scheuerman,* 51 Or. 49, 53 (93 Pac. 823, 17 L. R. A. (N. S.) 747); *Sink* v. *Allen,* 79 Or. 78 (154 Pac. 415); *Griffith* v. *Shipley,* 74 Md. 591 (22 Atl. 1107, 14 L. R. A. 405); *Arnd* v. *Aylesworth,* 145 Iowa, 185 (123 N. W. 1000, 29 L. R. A. (N. S.) 638); *Canajoharie Nat. Bk.* v. *Diefendorf,* 123 N. Y. 191 (25 N. E. 402, 10 L. R. A. 676); *Union Investment Co.* v. *Rosenzweig,* 79 Wash. 112 (139 Pac. 874). There was ample evidence, if believed, to warrant the jury in finding that the note was induced by

fraudulent representations, and that the capital stock issued to Hoffman was utterly worthless, and consequently by force of the statute Everding & Farrell assumed the burden of showing that it purchased the paper as a holder in due course.

7. The plaintiff admits that it paid $4,000 for a $5,000 note. The instrument was purchased after Everding & Farrell had ascertained from a bank that a $5,000 note would be worth face value if Toft signed it. It is not necessary to decide whether the discount was of itself enough to compel a finding of bad faith, but it is sufficient for the purposes of this controversy to say that evidence of the discount was admissible, especially when viewed in the light of the information received from the bank relative to Toft and the inquiries made or omitted concerning the other indorsers and maker of the note, and the jury was entitled to consider the fact of the discount along with the other evidence already narrated in determining whether the holder was chargeable with bad faith: 8 C. J. 509; *McNamara* v. *Jose,* 28 Wash. 461 (68 Pac. 903) ; 3 R. C. L. 1051, 1079; 7 Cyc. 930, 949. See, also, note to *Hogg* v. *Thurman,* as reported in 17 Ann. Cas. 383.

8. A person is permitted to resort to circumstantial evidence to show that the owner of a negotiable instrument is not a holder in due course, and indeed in many cases it is the only kind of evidence available to a party: 8 C. J. 496; 3 R. C. L. 1041; *Arnd* v. *Aylesworth,* 145 Iowa 185 (123 N. W. 1000, 29 L. R. A. (N. S.) 638); *Union Inv. Co.* v. *Rosenzweig,* 79 Wash. 112 (139 Pac. 874) ; *Bowman* v. *Metzger,* 27 Or. 23 (39 Pac. 3, 44 Pac. 1090) ; *Farmers' State Bk.* v. *West,* 77 Or. 602, 606 (152 Pac. 238).

9. The trial court properly refused to strike out the evidence relating to the fraud charged by the defend-

ants, and it would have been error if the court had directed a verdict, because on the record made by all the parties it was the exclusive province of the jury to determine from all the evidence whether plaintiff took the note in good or bad faith: 8 Cyc. 289; *Owens v. Snell*, 29 Or. 483 (44 Pac. 827); *Sink v. Allen*, 79 Or. 78 (154 Pac. 415.)

10. The plaintiff contends that it was error to instruct the jury that a verdict could be rendered which would discharge Hoffman and at the same time make Toft liable; and Toft argues that the verdict releasing the maker automatically discharges the indorser. At the very beginning of the investigation of this branch of the controversy it must be premised that for the purposes of this appeal the plaintiff has by its pleadings fixed the character of liability which it seeks to impose upon Toft. The complaint charges Toft with being an indorser in due course of business, and therefore he could not at the trial, nor can he on this appeal, be held liable as a maker or as a guarantor; and consequently the rights and obligations of Toft must be measured by the standard fixed for an indorser: *Deering & Co. v. Creighton*, 19 Or. 118, 121 (24 Pac. 198, 20 Am. St. Rep. 800); *Schlittler v. Deering Harvester Co.*, 3 Ga. App. 86 (59 S. E. 342).

11. The person who by the terms of the instrument is absolutely required to pay is primarily liable, and all other parties are secondarily liable: Section 6023, L. O. L. The maker is primarily liable because his promise is absolute, while the indorser is secondarily liable because his promise is contingent and accessorial, and when considered as parties to the instrument, the former is prior to the latter. Unless a note has reached the hands of a holder in due course, the

maker can defeat the instrument if it was induced by fraud.

12. The instant case is not governed by Section 5953, subdivision 3, L. O. L., which declares that a person secondarily liable on an instrument is discharged ''by the discharge of a prior party.'' The provision quoted from the statute only applies to a discharge by the act of the creditor, and does not include discharges by operation of law, for example bankruptcy, nor does it embrace a situation where after a trial on the merits the note is in effect destroyed because of a vice which is inherent in the transaction: 7 Cyc. 1048; 8 C. J. 612, 617; 10 Yale Law Journal, 94; 15 Harvard Law Review, 34.

13. If Section 5953, subdivision 3, L. O. L., only applies to discharges by some act of the creditor, then the general principles of suretyship govern. A discharge of the maker by virtue of a judgment predicated upon fraud in the note and bad faith on the part of the holder extinguishes that which has only appeared to be an obligation, but in the end and in its finality is a mere paper which in truth is not a real debt: 8 C. J. 612; *Richards* v. *Market Exchange Bank Co.*, 81 Ohio St. 348 (90 N. E. 1000, 26 L. R. A. (N. S.) 99). And therefore when after a trial on the merits it is ascertained that because of fraud and notice there is no subsisting debt of the maker, then by the same token there is no debt of the indorser. The judgment in favor of the maker, or principal, satisfies the note, and therefore on general principles of suretyship the indorser, or surety, is not liable because the judgment inures to the benefit of the surety: *Michener* v. *Springfield Engine & Thresher Co.*, 142 Ind. 130 (40 N. E. 679, 31 L. R. A. 59); *Leslie* v. *Bonte*, 130 Ill. 498 (22 N. E. 594, 6 L. R. A. 62); *Levi* v. *McCraney*, 1

Morr. (Iowa) 191; *Soward* v. *Coppage,* 10 Ky. Law
Rep. 436 (9 S. W. 389); *Evants* v. *Taylor,* 18 N. M.
371 (137 Pac. 583, 50 L. R. A. (N. S.) 1113); *Schlittler*
v. *Deering Harvester Co.,* 3 Ga. App. 86 (59 S. E. 342);
8 Cyc. 66.

Hoffman could be discharged only by finding fraud
in the note plus bad faith on the part of Everding &
Farrell, and on the case as made by the pleadings of
the plaintiff, Toft could only be held liable as an in-
dorser.  A verdict releasing the maker necessarily im-
plies fraud in the note followed by notice to the holder
and a verdict against the indorser, on the pleadings as
they now stand, in the same trial and on the same evi-
dence involves contradictory findings.  The verdict is
inconsistent with itself, and the instruction which per-
mitted the verdict was erroneous and probably mis-
leading.

The whole verdict is set aside, the entire judgment
is reversed, and the cause is remanded for further pro-
ceedings not inconsistent with this opinion.

                                                    REVERSED.

MR. CHIEF JUSTICE MOORE, MR. JUSTICE BEAN and
MR. JUSTICE BURNETT concur.